[No. F013559. Fifth Dist. Sept. 20, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS EDGAR DOUGLAS III, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, III, IV, and V.

274

## COUNSEL

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Steve Y. Masuda, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THAXTER, J.**—Appellant Thomas Edgar Douglas III and his brother, Bobby Dewitt Douglas, were charged and jointly tried by a jury for the murder of Lloyd Amey (Pen. Code,[1] § 187). Appellant was also charged as an accessory to the same murder (§ 32). The jury returned verdicts finding both appellant and Bobby guilty of second degree murder and finding appellant guilty as an accessory. Appellant was sentenced to a term of 15

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

years to life on the murder count. His midterm sentence of two years on the accessory count was stayed by the sentencing court per section 654.

In the published portion of this opinion we will agree with appellant's claim that the court committed prejudicial error when it denied his motion for separate trials and allowed use of a redacted version of appellant's postarrest statement without permitting appellant to present portions of the statement which tended to exculpate him from responsibility for the murder. For that reason we will reverse the murder conviction. In the unpublished portion of the opinion we will reject appellant's other contentions except one. Respondent concedes, and we agree, that appellant cannot ultimately stand convicted of both murder and of being an accessory to that murder.

FACTS

On January 15, 1989, Angela B. was released from juvenile hall. Angela's boyfriend, codefendant Bobby Douglas, along with appellant (Bobby's brother), picked her up from her mother's house that evening and brought her back to their house where they smoked about $40 worth of rock cocaine. Angela stayed the night there. The electricity was off at the Douglas house, and a small number of lights and appliances, including a swag lamp in the living room/dining room area, were being powered through an orange extension cord running from a neighbor's home.

The following morning, Angela, appellant, Bobby and a third Douglas brother, J., drove into Fresno to go to a department store where they exchanged a pair of tennis shoes for about $70 or $80. In turn they stole another pair of shoes, which they took to another store and again exchanged for cash. The trip netted them about $120 or $140.

The four drove back to Madera and stopped at Will Dawson's home where about 4:30 p.m. they purchased about five rocks of rock cocaine. Returning to the Douglas house, Angela, appellant and Bobby smoked all of the newly purchased cocaine; J. did not participate (nor did he participate in any subsequent drug consumption). By 6 p.m. the cocaine was gone.

Appellant left to purchase more cocaine; Angela testified she thought he again purchased it from Dawson. He returned with about $40 worth which he, Bobby, and Angela smoked immediately. Appellant again left to get more, this time expressly stating he was obtaining it from Dawson. As he was now out of money, he was only able to get about $20 worth "up front" from Dawson, i.e., on credit. Appellant, Bobby and Angela smoked it all. When they finished at 10:30 or 11, appellant took a pair of shoes to Dawson

and traded them for three rocks, which he brought home. Again, appellant, Bobby and Angela smoked it all. At some point, J. fell asleep on the couch.

About 1 or 1:30 on the morning of January 17, the three wanted still more cocaine. Dawson's wife forbade additional noncash transactions, however, so another source was needed. It was known by Angela and the two brothers that Lloyd Amey dealt in rock cocaine and that he was willing to trade it for leather jackets. Bobby indicated to Angela that they had leather jackets to exchange and that they would call Amey. Angela did not know about any leather jackets, however, and began to fear that something was going wrong. Appellant and Bobby talked about killing Amey, but Angela did not take the discussion seriously as they were all high and laughing.

Appellant placed a telephone call to Amey, pretending to be Bobby, and insisting that Amey come to the Douglas house to make the exchange. Bobby and Angela sat on the floor next to the fireplace while appellant walked around the house; then Angela heard a car pull up. Appellant went out through a door in the kitchen to the garage area which had been converted into a room; he left the door open. Bobby followed some minutes later. Angela could hear three people in the converted garage area and then heard loud noises, "like a fight going on." She heard Amey's voice saying, "Why? Why? I thought you were my friend. Leave me alone. Take my drugs, leave me alone." She saw the shadow of an arm holding a knife going up and down. She was so frightened she urinated in her pants. She hid in the bathroom.

A noise woke J. who had been asleep on the couch. He heard a voice in the garage area saying "No, please" and "Please help." J. ran to the door to the garage area and saw someone "swinging." He joined Angela in the bathroom; she described him as "scared, hysterical, same as me."

The sounds died down and the only light in the house went out. Some five minutes later, still in the bathroom, Angela saw the light come back on. Angela later learned that the extension cord had been cut, and the light and appliance cords had to be respliced into the cord. She came out to the fireplace and saw Bobby come back into the house from the converted garage; he looked pale and bloody. There was blood all over his clothing; "He looked like somebody just came out of a war zone." J. was seated on the couch, and Bobby told J. to take off his clothes and put on some sweats. When J. got out of his clothes, Bobby removed his own clothing, put on J.'s pants, and tossed his bloody clothes into the fireplace. He also burned Amey's wallet.

While Bobby's clothes were burning, appellant came in from the garage and told J. something, but Angela could not remember what it was. It may

have been a directive for J. to open Amey's car door. J. testified that at one point he heard a man's voice say "Go open the car door," and he went outside and opened one of the rear doors of the car. Appellant had "a little" blood on his clothing. He was pale and tense and had a kitchen knife in his hand.

Appellant told Angela and J. to get some blankets but Angela did not comply, and when she saw appellant with blankets she assumed he had found them himself. At some point, appellant threatened to hurt J. and Angela if they told the police anything. Bobby also threatened them.

From a window, Angela saw appellant and Bobby carrying Amey's body to his car. Thereafter, appellant drove away in Amey's car and was gone for some 10 minutes. When he returned, he cleaned up the garage area, using bleach and paint. Appellant came back into the house, and he, Bobby, and Angela smoked more rock cocaine. Angela presumed it to be Amey's cocaine as one of the two bottles was broken and there was blood on them. Angela asked Bobby what happened. He did not answer.

After they finished smoking the cocaine, Angela called for a taxi. All four took the cab to Angela's sister's home to see if they could stay the rest of the night. Her sister refused to allow appellant, Bobby, or J. to stay but did loan Angela some money to pay for the taxi. The four then walked to Angela's mother's house and spent the rest of the night in Angela's bedroom.

J. and appellant appeared to be asleep on the bed but Angela and Bobby sat and talked. Angela again asked Bobby to tell her what had happened. He said he did not know why he did it.

While in her bedroom, Angela learned from either appellant or Bobby that they had taken Amey's rings and they wanted Angela to pawn them, as she had California identification.

Shortly after 8 o'clock on the morning of January 17, Madera Sheriff's Sergeant Larry Elmore was dispatched to an open field in the Parkwood area of Madera where he found Amey's late-model car parked, its rear doors open. Amey's bloody body was in the backseat, wrapped in blankets and an orange electrical cord. A gravel-like substance, apparently cat box filler, was mixed with the blood on Amey's face and clothing.

An autopsy was conducted. The pathologist found some 24 stab wounds, 4 of which were potentially lethal. The scattered locations of the wounds around Amey's body, and the varying depths and widths of the wounds, suggested to the pathologist that more than one assailant was involved.

Early that afternoon, Sergeant Elmore received a call from Robert Miller who indicated he had information about where Amey was killed. Elmore and Detective Esteves picked up Miller who pointed out the Douglas house to them. After dropping off Miller, Elmore and Esteves drove back to the Douglas house where they observed appellant and Bobby standing outside.

The officers stopped and approached appellant and Bobby. After establishing that they both lived at the house, Elmore and Esteves asked them about the orange extension cord running from the neighbor's house to theirs; Elmore had noted its similarity to the cord found wrapped around Amey. One of the brothers explained that their electricity had been turned off and the neighbor was permitting them to "borrow" electricity. Appellant voluntarily invited Esteves inside to show him where the cord went. After a few minutes, Bobby went inside as well, and a short time later Esteves came out and told Elmore he should go in and look at something.

Elmore entered and noticed the television and light cords spliced into the orange extension cord in the living and dining room. He followed the cord to the converted garage where he noticed a large patch of wet paint on the carpeting; it had a pinkish tint to it, though the paint still in the bucket was white. Paint had been brushed onto a sofa and a clothes washer or dryer. Near the door was a cat box with a small amount of filler in it. A power saw was partially concealed in a pile of clothing; what appeared to be blood could be seen on the saw's body and cord. Elmore concluded he was in the location where Amey had been killed.

Appellant was interviewed that afternoon by Detective Louie Beard. After waiving his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), appellant talked to Beard about the homicide for nearly an hour. That statement, redacted per *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], was related to the jury by Beard.

According to Beard, appellant admitted that a telephone call was placed to Amey to exchange jackets for rock cocaine. Amey arrived in his car shortly thereafter, pulling into the driveway. Appellant went out to greet him, and when Amey entered the converted garage he was stabbed. Appellant did not admit to actually stabbing Amey. Amey expressed surprise and puzzlement, saying "Take the drugs, take the drugs." During the killing, appellant saw Angela standing in the doorway, screaming hysterically; he mentioned that she had urinated in her pants. Likewise he stated that J. saw the body after the killing and that he pushed him away from the doorway. J. became ill at the sight.

Appellant told Beard that Amey's wallet and rings were taken; the wallet was burned, the rings stashed in the house. About $100 worth of rock cocaine was also removed from Amey's body and was subsequently smoked. Appellant placed a butcher knife in the sink. He also mentioned the presence of another knife. Both knives were used on Amey. Appellant admitted wrapping Amey's body in more than one blanket. The body got tangled in the extension cord, and appellant cut the cord, leaving a portion wrapped around the body; he spliced the remaining cord later. He removed Amey's body from the house about 1 or 1:30 a.m. J. opened the car door. Appellant then drove Amey's vehicle away, returned, and cleaned up the scene of the killing with paint and bleach. He disposed of his tennis shoes, either in the garage area or in the fire. He observed clothing burning in the fireplace.

Later that day, after the interviews were completed, appellant and J. were taken back to the house by Elmore. The brothers showed Elmore where three yellow-metal rings taken from Amey had been hidden.

## DISCUSSION

**I. *Denial of Appellant's Motion to Exclude His Confession Did Not Violate His Right to Due Process.*** *

. . . . . . . . . . . . . . . . . . . . . . . . . . .

**II. *The Trial Court Erred in Denying Appellant's Severance Motion.***

Appellant made a pretrial motion to sever his trial from that of his brother Bobby. The court twice denied the motion. Appellant contends this was error.

The first motion for severance was made on grounds unrelated to the issue raised on appeal. The court allowed appellant to renew the motion the day before trial commenced and heard it in connection with motions in limine. At this hearing the primary issue discussed revolved around appellant's confession, which the prosecution wished to use in a "sanitized" form. (See *People v. Aranda, supra,* 63 Cal.2d 518.) Appellant's trial counsel expressly argued that a redacted version of appellant's statement, deleting portions which were exculpatory as to appellant but inculpatory as to Bobby, could prejudice appellant. Counsel further stated her intention to question Beard about the exculpatory portions of appellant's statement.

---

*See footnote, *ante,* page 273.

The court admonished Beard that in referring to appellant's statement "you should make references only to what Thomas Douglas did, not necessarily what Bobby did." The court did not, however, request a verbatim version of the "sanitized" statement the prosecutor proposed to offer. Nor did it inquire further into appellant's claim of prejudice. The court expressed "serious doubts" that the exculpatory portions of the statement could be received in evidence as admissions, but again denied the severance motion.

During trial, the prosecution offered Beard's testimony as to portions of appellant's interrogation statement. The court admonished the jury that the statement was admissible and was to be considered "only as against Tommy." Appellant's attorney attempted to cross-examine Beard regarding redacted portions of the confession. Bobby's counsel interposed hearsay objections to many of appellant's questions. The court sustained several objections but overruled others.

■ Penal Code section 1098 provides in pertinent part:

"When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials. . . ."

"The Legislature has in this manner expressed a preference for joint trials. [Citations.] The statute nevertheless permits the trial court to order separate trials, and the decision to do so is one 'largely within the discretion of the trial court.' [Citations.] Whether denial of a motion to sever constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion to sever. [Citation.]" (*People* v. *Boyde* (1988) 46 Cal.3d 212, 231-232 [250 Cal.Rptr. 83, 758 P.2d 25].)

■ In *People* v. *Aranda, supra,* 63 Cal.2d 518, the Supreme Court laid down "judicially declared rules of practice" for the implementation of section 1098 when one defendant's confession is to be admitted at a joint trial.

"When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted *without prejudice to the declarant.* By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial

statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (63 Cal.2d at pp. 530-531, fn. omitted, italics added.)

In *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], the United States Supreme Court held that use of a codefendant's confession inculpating the defendant in a joint trial violates the nonconfessing defendant's right of cross-examination secured by the confrontation clause of the Sixth Amendment. The violation is not cured by a jury instruction that the confession should be disregarded in determining the nonconfessing defendant's guilt or innocence. (*Id.* at p. 137 [20 L.Ed.2d at p. 485].)

■ In this case the court was presented with an extrajudicial statement by appellant implicating Bobby and was told that the prosecution intended to introduce that statement against appellant. The court permitted a joint trial on condition that Beard delete any references to Bobby in recounting the statement. What the court failed to do, however, was first ascertain "if all parts of the extrajudicial statements implicating [Bobby] [could] be and [were] effectively deleted *without prejudice to [appellant]*." (*Aranda, supra*, 62 Cal.2d at p. 530, italics added.) Although the court specifically found that insufficient evidence had been presented to show a prejudicial effect to either defendant, it did so without knowing exactly how appellant's statement would be edited by the prosecution and Beard. The prosecutor did not offer a transcript or other record of the redacted statement, and the court did not request one.

Appellant amply demonstrates the significance of this failure. When Beard testified as to the content of appellant's interrogation, some answers were misleading. For instance, during the interrogation appellant specifically stated at least twice that Bobby placed the telephone call to Amey. Beard's testimony on this point, however, was:

"Q. Can you summarize what he [appellant] said about his [appellant's] involvement in the homicide?

"A. Indicated a phone call was placed to Mr. Amey."

Beard's answer to the question calling for what appellant said about his own involvement in the killing completely distorted appellant's actual statement by unequivocally implying that appellant admitted making the call himself. That implication was strengthened by the court's admonition that the statement could be considered "only as against Tommy."

Similarly, during the interrogation appellant told Beard Bobby went outside to greet Amey and appellant was on his way out to join them when he heard Amey crying out after the stabbing began; he then ran back inside and pushed J. away from the door. While at other points he indicated he actually saw Bobby stab Amey, the clear implication of his statement is that Bobby, not appellant, went out to greet Amey. At trial, however, Beard's version contradicted what appellant actually said:

"Q.  Did he [appellant] say what he [appellant] did upon Lloyd Amey's arrival?

"A.  That—I believe he said he went out to greet Mr. Amey, or proceeded to the direction where Amey was coming to."

Regarding knives, Beard's testimony was similarly misleading. Appellant told Beard that Bobby used two knives in the attack on Amey, employing a butcher knife to stab Amey in the torso and using a "Rambo-style" knife on Amey's face. Appellant consistently denied stabbing Amey himself, only admitting to putting one or both knives in the sink afterward.

In relating appellant's story to the jury, Beard made the following statements:

"Q.  What did he [appellant] describe doing with this butcher knife?

"A.  Putting it in the sink.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Q.  Did he say he did anything with the butcher knife prior to putting it into the sink?

"A.  I don't believe so.

"Q.  Did he make reference to more than one knife, more than this butcher knife?

"A.  Yes, he did.

"Q.  How many knives did he make reference to?

"A.  Two knives.

"Q. And did he indicate that one of the knives had been a butcher knife?

"A. Yes.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Q. As far as the two knives that you earlier referred to, did he describe both of those knives having been used on Lloyd Amey?

"A. Yes.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Q. Did he indicate to you which knife had caused the initial stab wound?

"A. Yes, indicated to me it was the butcher knife.

"Q. Did he give you a specific location where the initial stab wound had occurred?

"A. In the middle of the back upper shoulder blade area.

"Q. Concerning the second knife. Did he indicate to you where the second knife had been used on the victim?

"A. The facial area."

With this testimony the jury knew that two knives were used in the attack on Amey and that appellant denied having done anything with *one* of the knives prior to putting them in the sink. Moreover, Beard's testimony clearly implied appellant told Beard that Angela and J. (the only others in the house) were uninvolved in the actual stabbing. The strong implication, then, is that appellant told Beard that he and Bobby each used a knife in the attack on Amey. The jury was not told that appellant repeatedly denied using either knife.

Appellant attempted to correct the misleading nature of Beard's testimony on cross-examination. He attempted to show that in his actual statement appellant denied using a knife or harming Amey in any way, denied making the telephone call to Amey, and expressed fear of Bobby. Each attempt was thwarted when the court sustained Bobby's hearsay objections.

As appellant points out, the court's evidentiary rulings during appellant's cross-examination of Beard were clearly erroneous under Evidence Code section 356. ■ It states that "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . ." (Evid. Code, § 356.) This rule applies to admissions and confessions in criminal cases (*People* v. *Crowl* (1938) 28 Cal.App.2d 299, 307-308 [82 P.2d 507]) and applies even if the omitted portions of the conversation are self-serving (*People* v. *Hansen* (1933) 130 Cal.App. 217, 220 [19 P.2d 993]; see *Rosenberg* v. *Wittenborn* (1960) 178 Cal.App.2d 846, 851-853 [3 Cal.Rptr. 459].)

"It is an elementary rule of law that when admissions of one on trial for the commission of a criminal offense are allowed in evidence against him, all that he said in that connection must also be permitted to go to the jury, either through cross-examination of the witness who testified to the admissions or through witnesses produced by the accused. The fact that declarations made by the accused were self-serving does not preclude their introduction in evidence as a part of his whole statement, provided they are relevant to, and were made on the same occasion as the statements introduced by, the prosecution." (29 Am.Jur.2d, Evidence, § 599, pp. 654-655, fns. omitted.)

■ By denying appellant's severance motion without thoroughly inquiring into the content of the "sanitized" statement to be offered against appellant, and without fully considering the prejudice to appellant inherent in redacting his statement, the court set the stage for an inevitable collision between Bobby's constitutional rights protected by the *Aranda/Bruton* decisions and appellant's right to have the jury hear his entire statement as provided in Evidence Code section 356. While *Aranda* offers as an option the redaction of the confession, it expressly limits that option to cases in which deletions are made without prejudice to the declarant. (63 Cal.2d at p. 530.) When deletions cannot be made without prejudice to the declarant the court should either grant severance or exclude the statement. (*Id.* at p. 531.)

In *People* v. *Matola* (1968) 259 Cal.App.2d 686 [66 Cal.Rptr. 610], the court sagely commented on the need for early detection of risks involved in deleting portions of a codefendant's confession in order to avoid "the *Aranda* crunch" at trial. (*Id.* at p. 688.) Although dealing with a claim of prejudice by the non-confessing defendant, the court recognized the risks of prejudice to the confessing defendant.

"In ruling upon a severance motion, the trial court must be alert at the outset to factors which are harbingers of editorial failure. If the parts of the

confession affecting a codefendant favor or may favor the confessing defendant, the deletion of those statements is not going to stick. The declarant's counsel will want to bring them out, either upon cross-examination of the person who testifies to the confession, or upon direct examination of the declarant if he takes the stand. *Were he prevented from bringing out evidence favorable to his declarant client, to protect the nondeclarant, the declarant would himself be prejudiced by the joint trial.*

"The trial court in this case denied the motion to sever solely on the basis that the prosecuting attorney represented that the confession could and would be successfully edited. The trial court had no reason to doubt the prosecutor's good faith in so stating, but all the prosecutor could assure the court was that he himself would not offer the offending passages. His own restraint could not affect defense counsel's duty or strategy. *Had the trial court closely examined the confession, including the proposed excisions, the ineffectiveness of the prosecutor's assurance would have been evident.* The court prejudicially erred in denying the severance motion." (259 Cal.App.2d at pp. 692-693, italics added.)

We know of only a handful of California cases in which a confessing defendant claims on appeal that use of his or her redacted confession operated to his or her prejudice. In the most recent, *People v. Jackson* (1987) 192 Cal.App.3d 209 [237 Cal.Rptr. 373], the court found "no error" in the editing of a confession. The case is not particularly helpful here, however, because neither defendant moved for severance. (*Id.* at pp. 214-215.) Here appellant moved to sever, specifically arguing that he would otherwise have to attempt to introduce the deleted portions of his confession to avoid prejudice. The lower court nonetheless denied the severance motion.

In *People v. Tealer* (1975) 48 Cal.App.3d 598 [122 Cal.Rptr. 144], over a defense objection, the trial court allowed the prosecutor to use a sanitized version of defendant Tealer's post-arrest statement (" 'We were just passing by the place and decided to rob it' ") by substituting "I" for "we." (*Id.* at p. 601.) The appellate court held that the change was *Aranda* error because it threw "the entire onus of the planned robbery on defendant by converting the sometimes ambiguous and partially exculpatory 'we' into an unmistakable 'I.' " (48 Cal.App.3d at pp. 603-604.) The court opined that the error, standing alone, might not have been prejudicial, but because it led to defendant's testimonial denial of making any statement, improper comment on that testimony by the prosecutor, and a jury instruction running afoul of *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], reversal was required. Again, *Tealer* is not particularly instructive here because of the factual differences and because it does not appear the defendant there unsuccessfully moved for a separate trial.

In *People* v. *Terry* (1970) 2 Cal.3d 362 [85 Cal.Rptr. 409, 466 P.2d 961], the trial court denied a pretrial severance motion. During trial[3] the court attempted to comply with *Aranda* by ordering that defendant Allen's confession should be sanitized by deleting all references to codefendant Terry. As the Supreme Court noted, "[t]he result was somewhat ridiculous. [Allen's] confessions were read to the jury practically in their entirety, but everywhere the name 'Harold' (Terry) appeared, the word 'deleted' was substituted." (2 Cal.3d at pp. 384-385.) On appeal Allen complained this procedure was prejudicial to her.

". . . It is her view that the deletions distorted her confessions to her prejudice. She urges that since her defense was duress caused by fear of Terry, she was entitled to have the jury know that in her first confession she made reference to Terry having ordered her about during the two crimes. The later-admitted psychiatric testimony tended to show that she had a particular fear of Terry, not of 'Mr. Deleted.' Thus, so she claims, it was error to distort her confessions by removing all reference to Terry." (2 Cal.3d at p. 389.)

The Supreme Court gave short shrift to Allen's claim. It found no prejudice to Allen because "it is impossible to believe that any reasonable person could have listened to [Allen's] confessions with the word 'Terry' stricken and the term 'deleted' inserted without knowing that the word 'deleted' referred to Terry." (2 Cal.3d at p. 389.)

By contrast, in our case the deletion of references to Bobby in appellant's statement clearly, and inaccurately, implied that appellant admitted his involvement in conduct he had explicitly disclaimed. Appellant was then improperly prevented from presenting evidence that his actual statement was exculpatory on major points. The prejudice to him is obvious and serious. If the court had granted the severance motion, deletions of appellant's statement would not have been required to protect Bobby under *Aranda/Bruton*. Because the evidence of appellant's involvement in the actual killing of Amey was far from overwhelming, we cannot dismiss this error as harmless. (See *People* v. *Massie* (1967) 66 Cal.2d 899, 921-924 [59 Cal.Rptr. 733, 428 P.2d 869].) Reversal of the murder conviction is required.

Appellant does not contend that the error affects his conviction for being an accessory, and we do not see how it could. Appellant freely and fully confessed to acts supporting the accessory conviction. None of the deletions

---

[3]The *Terry* trial began four days after *Aranda* was decided, but the court and counsel did not become aware of the *Aranda* decision for some three weeks. (2 Cal.3d at p. 384, fn. 7.)

from his statement distorted its meaning as it affected his conduct after Amey's killing. The evidence of that conduct would not have differed significantly if produced at a separate trial. Thus, we conclude that the denial of the severance motion does not require reversal of the accessory conviction.

III.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment of conviction of second degree murder is reversed. The judgment of conviction of being an accessory is affirmed. The cause is remanded for further proceedings consistent with this opinion. If, on remand, appellant is convicted of murder or a lesser included offense, the lower court shall, upon the judgment of such conviction becoming final, vacate the judgment of conviction for being an accessory. If appellant is not convicted of murder or a lesser included offense, the court shall resentence appellant on the accessory conviction.

Ardaiz, Acting P. J., and Bianchi, J.,† concurred.

---

*See footnote, *ante*, page 273.

†Retired judge of the Kern Superior Court sitting under assignment by the Chairperson of the Judicial Council.