Filed 5/23/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S048543 |
| v. | ) | |
| | ) | |
| CHARLES F. ROUNTREE, | ) | |
| | ) | Kern County |
| Defendant and Appellant. | ) | Super. Ct. No. 57167 |
| _____ | ) | |

A jury convicted defendant Charles F. Rountree of the first degree murder of Diana Contreras under the special circumstances of kidnapping- and robbery-murder; of kidnapping her to commit robbery; and of robbing her. It also found that he personally used a firearm in committing each crime. (Pen. Code, §§ 187, 190.2, subd. (a)(17), 209, subd. (b), 212.5, subd. (b), 12022.5, subd. (a).)[1] After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

## I. THE FACTS

### A. Guilt Phase

#### 1. Overview

The evidence showed that on December 9, 1993, defendant and his girlfriend (soon to become wife), Mary Elizabeth Stroder, kidnapped 19-year-old Diana Contreras from a Bakersfield shopping mall, robbed her, drove her to a remote location, and shot her to death.[2] They were arrested a few days later in Kansas while driving Diana's car.

#### 2. The Evidence

On the morning of December 9, 1993, Diana Contreras went to the Valley Plaza mall in Bakersfield in her red 1992 Eagle Talon. A security officer saw a woman matching her description with a red car between 9:00 and 9:40 a.m. According to business transaction records, she withdrew $20 from an ATM at the mall at 8:55 a.m. and made various purchases between 10:15 and 11:15 a.m. Diana had been scheduled to babysit at a sister's house beginning at 1:30 p.m. that day. But she never appeared. Her family became concerned because it was unlike her to miss or be late to an appointment like that. They tried but failed to find her.

Oil company workers discovered Diana's body lying face up the next morning in a rural spot about two to two and half miles from the town of Taft. The body was in a field, about one quarter of a mile to 500 yards from Airport Road, a road often used by oil field workers. A busier road was about 1.6 miles

---

[2] Stroder was a codefendant at trial and was also found guilty of these crimes. She did not receive the death penalty, and thus is not involved in this appeal.

away. Four expended cartridge cases were found near the body, about 10 feet from the feet.

An autopsy revealed that Diana had died of three gunshot wounds. Among other injuries, her heart had been "destroyed." Death would have occurred either instantaneously or within seconds. The nature and direction of the wounds indicated that one shot was fired when she was standing, and the other two came from near her feet after she fell to the ground. The physical evidence indicated that she was shot from very close range. It also indicated she was holding something, perhaps her purse, when she was shot. One bullet went through what she was holding.

Bank records showed that at 11:36 a.m., December 9, 1993, someone withdrew $100 from Diana's bank account at an ATM at the Stockdale branch of Wells Fargo Bank in Bakersfield. Other attempts to withdraw money, some successful, some unsuccessful (because they exceeded the $300 daily transaction limit), were made on that account at a Wells Fargo branch on White Lane and Stine Road in Bakersfield beginning at 1:06 p.m., and then again at the Stockdale branch beginning at 1:49 p.m. A total of $280 was withdrawn that day. Between December 10 and December 15, 1993, someone made additional withdrawals totaling $1,800 on that account from ATM's in Las Vegas, somewhere on Interstate 70, and in Denver. Some unsuccessful attempts were also made. One of the ATM transactions at the White and Stine branch was photographed. The photographs show a White man (obviously defendant) making the transaction from a car that appears to be a Volkswagen Golf.

During the afternoon of December 15, 1993, Kansas police on the lookout for Diana's missing Eagle Talon stopped it on Interstate 70 near WaKeeney, Kansas. Stroder was driving, and defendant was a passenger. The car's trunk contained a loaded Winchester rifle. Stroder was carrying a purse containing

3

Diana's Social Security card. Inside the car, police found Diana's driver's license, her Wells Fargo checkbook, her ATM card, motel receipts from Las Vegas and Denver, a marriage license, insurance papers for a 1986 Volkswagen Golf, a Missouri license plate with the number HIX939, a box containing sixteen .30-.30 Remington shells, and a cloth bag containing eight Winchester .30-.30 shells.

Stroder's father testified that around December 1993 his daughter and, part of the time, defendant were living with him in Whitewater, Missouri. The father owned a 1986 Volkswagen Golf, license plate number HIX939, as well as the Winchester rifle found when defendant was arrested. Stroder had been using the car for several weeks. It had a mechanical problem. On December 3, Stroder was supposed to meet her father, but she did not appear. He next saw her after her arrest. He had noticed the rifle was missing after December 3.

Defendant and Stroder got married at a wedding chapel in Las Vegas on December 11, 1993. Before the wedding, they asked a chapel employee where they could find an ATM to get money. They left briefly, then returned, paid for the wedding ceremony, purchased two wedding rings, and got married. They were wearing the rings when they were arrested.

After the shooting, the Volkswagen Golf that Stroder's father owned was towed in Bakersfield as an abandoned car. Stroder's fingerprints, but not defendant's or Diana's, were found on and in the car. The Golf's front tires matched tire tracks found at the scene of the shooting. None of the tracks at the scene matched the Eagle Talon's tires. Stroder's shoes could have made some of the shoe prints at the crime scene. A pair of shoes belonging to defendant did not match any of those prints.

The rifle found in the car when defendant was arrested was a "leverage-action Winchester, Model 95, 30/30 caliber rifle." Ballistics analysis established that it had fired the four shell casings found near Diana's body. To fire the rifle,

4

one must move the lever down to cock the hammer into the ready position and depress the safety. This action must be repeated for each shot. It took six pounds of pressure to pull the trigger, which a criminalist described as a "moderate trigger pull."

Kern County Sheriff's Deputy Joseph Giuffre interviewed defendant in Kansas and again later in California. On both occasions, after first waiving his constitutional rights, defendant admitted his involvement in the shooting. In order to protect the rights of codefendant Stroder, Deputy Giuffre testified about a version of defendant's statements redacted to eliminate any mention of Stroder. Thus, the jury heard the following.

When he first spoke with Deputy Giuffre in Kansas, defendant said he was from Missouri and drove to Bakersfield in a Volkswagen Golf. The .30-30. rifle was in the car. He arrived in Bakersfield the day before the shooting. He first saw Diana Contreras at the Valley Plaza shopping center. Giuffre testified defendant said he decided to rob her because she " 'just seemed like she wouldn't be as much trouble.' " She got in his car. The rifle was where the gear shift is, partly in defendant's lap and pointing down. Defendant admitted Diana was not in his car voluntarily.

Diana had only seven dollars. Defendant said to her, " 'is this all you got, all you can give me?' " She responded, " 'well, I can go to the bank . . . and get you some money and that's it, but I can only get $100 out.' " Defendant then drove to a Wells Fargo bank and used Diana's ATM card to withdraw $100. Diana gave him her personal identification number (PIN) so he could do so. Because Diana had a car phone, he did not take her back to her car. Instead, he "drove out to an area near some call boxes to drop her off so he would have time to get away." He said he "didn't want to drop her off too early because he could be caught for kidnapping." He described the area where he took her as "desolate

5

and remote with no phones around." He said he planned to "drop her off and drive off. He thought about tying her up but figured it gets cold and if no one came along she would die."

When they arrived, Diana got out of the car and came around to his side and he pulled the gun out and said, " 'just go, just start walking that way.' " He thought she came to his side of the car "to plead for him to drive her back in." Diana began crying and arguing. She came close to him and said, " 'don't leave me here, don't shoot me, don't do this.' " Defendant said, " 'just walk, you'll find somebody. I don't want to shoot you. I don't want to hurt you.' " At some point, he got out of the car with the rifle. Regarding why he did so, he said, " 'it's just that when she got out not to leave her and stuff . . . . And she was like walking around the back, I guess, to my side, and I jumped out because I didn't know what was going on, and I just grabbed the gun and I said just go. Because I thought maybe I could scare her . . . .' "

Defendant said he did not remember much about what happened next, Deputy Giuffre testified. "The only thing he remembers is three shots went off and he remembered seeing her face because he had nightmares where he'd see her and her eyes were open and that is pretty much all he remembered." Defendant said he did not know why he shot Diana. "He said he didn't do it purposely. He wasn't planning on killing her. He guessed that when she came up to him he didn't aim and shoot. If he would have aimed and shot he would have shot her in the heart or head or something. He just did it and he didn't know whether it was reaction or if he was just scared and he twitched." He said "she started screaming and she just kept screaming, and he didn't know what to do so he shot her again. One shot missed because he was nervous, then he shot her again." He was holding the rifle by his hip and waist area. One bullet went through her purse.

6

Defendant said that after he shot Diana she fell down. "She was screaming and yelling and he shot her again and he missed and she was in pain, and he shot her again because he didn't want her to go through any more pain." She was on the ground when he shot her the second time. He fired the third time because he thought the second shot missed. Defendant also gave this account of the shooting: "He was telling her to walk and go and get away because the road went around down that way, and he was just going to drive out and stuff, and he shot her, she fell back and she was screaming and he shot her again. He thought he missed because it ricocheted up on the top, and she was screaming because he started to move away in the car, and he turned around and shot her again so she wouldn't go through no pain."

Regarding the sequence of shots, Deputy Giuffre testified defendant told him "he didn't shoot her three times bang, bang, bang. He shot her, she fell. He was freaking out and didn't know what to do. She was sitting with her arms up, screaming, and he shot again and he saw the gravel hit above, so he doesn't know if it went through her when she was on the ground or not. So he shot her again and she stopped." He said he shot her accidentally. "[I]t just happened." He said that if he had planned to shoot her, " 'I would have hid the shells and dragged her off somewhere if I was some insane killer just wanting to kill her.' "

Defendant took Diana's bags and drove away in the direction in which he had come. "He was so scared he just drove off." He drove back into town, "parked and sat there and cried. He didn't know what to do." He got money from a bank, using the PIN Diana had given him. Then, because the Golf was having mechanical problems, he decided to take Diana's car. He got money again, this time from another bank. Then he drove to Las Vegas and other places, using Diana's ATM card occasionally to get money. He signed some receipts for money

in Utah with the name "Robert Contreras" because he knew Diana's father's name began with the letter "R."

Defendant took Diana's driver's license from her purse "just for memory, just to give some respect because he prayed, and it is against his morals and religion and he's never hurt anybody before." The driver's license had gun powder on it. He kept her checkbook "for no particular reason." He later threw the purse away, but he did not remember where. He said he took a license plate from the Golf "in case he needed to switch the plates."

The second time Deputy Giuffre spoke with defendant, this time in California, defendant gave another account of the events. He said he had kept the gun in the car for protection. He chose to rob Diana because "she was just a little girl that wouldn't fight or nothing." He told her he was trying to get to his aunt's home and ran out of money. Defendant said Diana looked down where the gun was sitting, and he told her, " 'I don't want to hurt you. I just want some money.' " She gave him seven dollars.

Defendant again explained his plans after withdrawing the money from the first bank. He said, " 'I was gonna take her back, and while we were talking and the car phone was brought up, . . . she said she wouldn't call because she gave me the money freely, . . . and I was like, well, if someone . . . threatened me, I guess, I know I would call anyway.' " He added, " 'I told her I would drop her out . . . parked away from the highway, up in the city more to give me a chance to drive off.' " Diana was nervous and said, " 'okay.' " He told her "he wouldn't leave her off somewhere where it's too far from a call box or a gas station or town." When Diana got out of the car, she was saying, " 'just drive me back in to town.' "

Defendant said "he checked the engine because they had gone over a bumpy road." That was why "he got out of the car in the first place." He "said he slammed the hood down and walked over. He doesn't remember if he was

8

adjusting the gun or not because when she was walking around he told her he was moving the gun and then that is when he stood up with the gun in his hand, and he guesses that is when she got really scared. He's a little guy himself and she is little. When she started pleading and stuff, he had the gun there and stuff. He was going to drive her back in to town, but then he didn't know what was going to happen. Then she ran up." He "didn't know if she hit the barrel and it went off or if he just twitched and it went off because that kind of gun you really just can't twitch to pull the trigger, even though it is an easy trigger pull. He just remembered she was really close to the gun. He thinks she ran in to the gun, that is when it went off, but he really can't remember if that is what happened or if he twitched," Deputy Giuffre testified.

Defendant said "when he saw the bullet hole he was flipping out. It was right under the heart and with it that close he knew it tore her up unless it went straight through her, and she was screaming in pain and that is when he shot her twice and she just died." "Because of the way she was shot, even if he tried to get her back to a hospital, she would have died anyway . . . ." At that point, defendant said, "He wasn't even thinking. He just grabbed. He wasn't even thinking of grabbing her purse and stuff." Deputy Giuffre testified, "He said there was a bullet hole through the purse and the driver's license should have a black powder mark where the bullet came through the driver's license. She had her purse and packages in her hand."

Defendant said "he never physically touched [Diana] at all. He never forced her in to the car physically. He never pointed the gun at her except when this went off. And even then he wasn't really pointing at her because he had it mostly to the ground. She just ran in to it and it went off." After he shot Diana, he "just happened to run" across the second bank where he got money "by luck."

9

Deputy Giuffre testified that it takes about 11 minutes to drive from the Valley Plaza mall parking lot to the Stockdale bank branch, about 40 minutes from that bank to the scene of the shooting, and about 32 minutes from the scene of the shooting to the White and Stine bank branch. The distance from the parking lot to the first bank and then to the scene of the shooting is a total of 34.7 miles.

Defendant cross-examined prosecution witnesses but presented no witnesses of his own.

**B. Penalty Phase**

The prosecution presented evidence of defendant's felony convictions in Missouri in 1991 and 1992, including two for second degree burglary, one for forgery, and one for first degree "tampering," charged as "unlawfully operating an automobile."

Diana's father, one of her sisters, and a high school friend testified about her and the impact her death had on them and the rest of her family.

Defendant presented a substantial case in mitigation. His mother and stepfather testified about his childhood and good character. His Sunday school teacher and several friends also testified about his good character. Defendant said and wrote various things after his arrest indicating remorse. His aunt lived in Northern California and had invited defendant's family to stay with her.

Dr. John Byrom, a clinical psychologist, testified that defendant is neither psychotic nor sociopathic. In his opinion, defendant "is not an inherently violent person." He also believes defendant "has some level of remorse for what he did." Defendant "would be adaptable to the prison environment," and would have a low propensity for violence in prison.

## II. DISCUSSION

### A. Denial of Change of Venue

Defendant and codefendant Stroder moved to change venue from Kern County. The trial court denied the motion without prejudice before trial and denied renewed motions during and after jury selection. Defendant contends the court prejudicially erred.

#### 1. Procedural Background

In December 1994, codefendant Stroder filed, and defendant joined, a motion for change of venue. Attached to the motion was a copy of newspaper clippings from The Bakersfield Californian about the crime, the results of a public opinion survey, and a flier for a "rally and March for Crime awareness" scheduled for May 14, 1994, at which members of the victim's family were scheduled to speak.

The court conducted an evidentiary hearing on December 16, 1994. Defendants placed into evidence additional newspaper articles, and evidence regarding a march held on July 9, 1994, called "Love for Life" and described as the "2nd Contreras family rally [for] anti-crime anti-violence." At most 50 people attended this event. Polly Klaas's grandfather was among the speakers.

Dr. Terry Newell testified about a public opinion survey he conducted in November 1994 at the defendants' request. Of those surveyed, 81.4 percent recognized the case, a number that increased to 85 percent when additional facts were presented. Of those who knew about the case, 22.3 percent believed defendant was "definitely guilty," 24.1 percent believed he was "probably guilty," 52.2 percent had formed no opinion, and 1.3 percent believed defendant "was 'not guilty' until proven so in court." Including those who had not heard of the case, this meant that over 60 percent of the total surveyed had formed no opinion about

11

defendant's guilt. When asked what penalty they would choose if they found defendant Stroder guilty of murder, 52.7 percent of those who knew about the case said they would vote for the death penalty, 21.9 percent for prison without parole, and 25.4 percent had no opinion. The survey did not ask the last question about defendant, but Dr. Newell estimated that about 54.8 percent of those who knew about the case would have voted for the death penalty as to defendant.

The survey did not ask if the interviewees could set aside their opinion and decide the case based on evidence presented in court. Those who indicated they would vote for the death penalty were not asked whether this opinion was based on information about this case or the belief that death is the appropriate penalty for any murder.

A Bakersfield resident testified at the hearing that based on what he had heard, he believed defendant was guilty and "should be hanged for what he did."

After the hearing, the court took the matter under submission. It stated that any ruling denying the motion would be without prejudice to renewal during jury selection. It denied the motion later.

In June 1995, defendant renewed the change of venue motion during jury selection. The court postponed a ruling until after jury selection was completed. Later, at the end of jury voir dire, defendant filed an update of evidence of publicity and renewed the motion. He argued that 61 of the 82 persons remaining on the jury panel had heard something about the case, and 26 had "formed an opinion that the defendants were either guilty or guilty of something." The court denied the renewed motion. It stated, "There isn't a juror remaining who indicates they could not set aside whatever it was that he read or heard, whatever opinions they may have formed. I think they will judge this case solely, exclusively, on the evidence presented to them in this courtroom."

12

After the parties exercised their peremptory challenges, and the actual jury was selected, defendant again renewed his motion. He noted that he had exhausted his peremptory challenges. He said he would additionally have challenged one particular juror if he had had an additional peremptory challenge. The court again denied the motion. It stated that all of the jurors and alternates had indicated "without hesitation" that "they could be fair and impartial to both sides, they could set aside anything that they've read, as to those that did read something, as to those who did form an opinion, there were none of this panel that indicated they could not set aside and base their decision solely, exclusively on the evidence presented to them in this courtroom. [¶] There was nothing about anything they read that would prompt them to be anything other than fair, impartial in this case."

### 2. *Analysis*

On a defendant's motion, the court must order a change of venue "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a); see *People v. Famalaro* (2011) 52 Cal.4th 1, 21.) On appeal from the denial of a change of venue, we accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county. In deciding whether to change venue, the trial court, and this court in its independent review, considers several factors, including the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the defendant's status within the community, and the victim's prominence. On appeal, a defendant challenging the court's denial of a change of venue must show both error and prejudice, that is, that it was not reasonably likely the defendant could receive a

13

fair trial at the time of the motion, and that it is reasonably likely he did not in fact receive a fair trial. (*People v. Famalaro*, *supra*, at p. 21.)

The charged offense, a capital murder, is most serious. This factor weighs in favor of a change of venue but is not itself dispositive. Indeed, unlike some cases where we have upheld the denial of a change of venue, defendant was charged with a single murder, not multiple murders. (*People v. Farley* (2009) 46 Cal.4th 1053, 1083, and cases cited.) "[T]his case lacked 'the sensational overtones of other killings that have been held to require a change of venue, such as an ongoing crime spree, multiple victims often related or acquainted, or sexual motivation.' " (*People v. Fauber* (1992) 2 Cal.4th 792, 818.)

Defendant relies heavily on the nature and extent of the publicity in his argument. We have reviewed that publicity. After the crime and in the days leading up to and after defendants' arrest in Kansas, the local newspaper understandably contained numerous articles about the case. But the articles were generally factual, fair, and not inflammatory. Some articles expressed sympathy for the victim and her family and either urged the death penalty or quoted others as urging the death penalty. But the press coverage was also reasonably balanced. The articles generally referred to the defendants as the "accused" killers. One article, headlined "Accused killers face death," quoted defendant's stepfather as saying that defendant is " 'an all-right kid' " and " 'I don't believe he did it.' " Another article at the time of the preliminary hearing, headlined "First gunshot in killing accidental, defense says," presented the defense side of the case. The articles did not reveal incriminating facts or evidence not actually presented at trial, which helped minimize any possible prejudice. (See *People v. Farley*, *supra*, 46 Cal.4th at p. 1084.) As a whole, the publicity, while a cause for concern, was far less pervasive and potentially prejudicial than, for example, that in *People v. Leonard* (2007) 40 Cal.4th 1370, 1395, which we described as "sensational and

14

extensive." The passage of time between most of the publicity and the trial in 1995 also blunted its prejudicial impact. (*People v. Prince* (2007) 40 Cal.4th 1179, 1214.) The publicity, while weighing in favor of a change of venue, did not itself make it reasonably likely defendant could not receive a fair trial. (*People v. Famalaro*, *supra*, 52 Cal.4th at p. 23.)

Defendant also notes that two marches in Bakersfield related to this case also received publicity. The second was attended by at most 50 people. So far as the record shows, on neither occasion was there any inflammatory call for vengeance against these particular defendants. The two marches also did not compel a change of venue.

Defendant relies in part on the public opinion survey conducted on the two defendants' behalf. It showed that a high percentage of the community had heard of the case and many had formed an opinion regarding defendant's guilt. But the degree of exposure was not significantly higher than in other cases in which a change of venue was not required. (See *People v. Leonard*, *supra*, 40 Cal.4th at p. 1396 [85 percent had heard of the case and, of those, 58 percent believed defendant was probably or definitely guilty]; *People v. Ramirez* (2006) 39 Cal.4th 398, 433 [94.3 percent had heard of the case and 51.7 thought defendant was responsible for the charged crimes]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 45 [over 71 percent had heard of the case and, of those, over 80 percent thought defendant was definitely or probably guilty].) Moreover, the survey did not ask whether the interviewees could set aside anything they had heard of the case and decide guilt or innocence based solely on the evidence presented at trial. The survey did not establish a reasonable likelihood defendant could not receive a fair trial.

The community was Kern County. In *People v. Weaver* (2001) 26 Cal.4th 876, the defendant moved to change venue from Kern County. At the time of that

15

trial, 1985, Kern County had a population exceeding 450,000 and Bakersfield, where trial was held, one of 200,000. We described the size of the community as "relatively neutral." (*Id*. at p. 905.) The prosecutor's opposition to the change of venue motion in this case represented, without contradiction, that, according to the 1990 census, Kern County had a population of 543,477, and Bakersfield one of 331,089. This was a much larger population than that in some cases in which we upheld denial of a change of venue. (E.g., *People v. Hayes* (1999) 21 Cal.4th 1211, 1250-1251 [trial held in Santa Cruz County with a population under 200,000].) The size of the county supported the conclusion that an unbiased jury could likely be found.

Defendants were outsiders from Missouri, which weighs somewhat in favor of a change of venue. But they were both White and were a man and a woman. Hence, they were not outsiders in any ethnic, racial, or gender sense. They were not members "of any racial or ethnic group that could be subject to discrimination." (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1397, citing *Odle v. Superior Court* (1982) 32 Cal.3d 932, 940, 942.) Their status within the community did not compel a change of venue.

Although the media portrayed the victim and her family sympathetically, she was not a prominent member of the community. This factor weighed against a change of venue. (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1397.)

Defendant cites *People v. Williams* (1989) 48 Cal.3d 1112, where we held the trial court erred in denying a change of venue from Placer County. But that case was very different. At the time of that trial, Placer County had a population of 117,000 (*id*. at p. 1126), much less than that of Kern County at the time of this trial. "The small size of the community in *Williams* was reflected in the fact that over one-third of the number of potential jurors knew people connected to the case, including the victim, members of her family, and the district attorney or

16

investigators . . . ." (*People v. Vieira* (2005) 35 Cal.4th 264, 282-283.) Moreover, in *Williams*, "the victim was a White woman whose family had ' "prominence in the community," ' whereas the defendant was from Sacramento, an outsider, and a Black man in a county with less than 1 percent Blacks, resulting in 'social, racial and sexual overtones.' " (*People v. Vieira*, *supra*, at p. 283, quoting *People v. Williams*, *supra*, at p. 1129.) Nothing in our opinion in *Williams* supports finding error here.

Accordingly, we agree with the trial court that it was not reasonably likely defendant could not receive a fair trial in Kern County.

Defendant has also not shown prejudice. The actual jury selection in this case indicated that defendant did receive a fair trial. Many of the prospective jurors, including eight of the 12 actual jurors, had heard something about the case, and some had to be excused for cause due to the publicity. But many of the jurors had not heard of the case or had not formed an opinion about guilt. Especially important, *all* of the jurors who were not excused for cause either had not heard of the case, had not formed any opinion as to guilt, or assured the court they could set aside any preformed opinion and decide the case solely based on the evidence presented in court. (See also the discussion in pt. II.B.1., *post*.)

" 'The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.' (*Patton v. Yount* (1984) 467 U.S. 1025, 1035 . . . .) 'We must distinguish between mere familiarity with [the defendant] or his past and an actual predisposition against him.' (*Murphy v. Florida* [(1975) 421 U.S. 794,] 800, fn. 4].)" (*People v. Farley*, *supra*, 46 Cal.4th at p. 1086.) "The trial court, which observed the jurors' demeanor, expressly found they had demonstrated an ability to set aside any preconceived impressions derived from the media." (*Id*. at p. 1087.) This was sufficient. As

17

the high court has stated, " 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " (*Beck v. Washington* (1962) 369 U.S. 541, 557; see *People v. Farley*, *supra*, at p. 1086; *People v. Weaver*, *supra*, 26 Cal.4th at p. 908.)

It is true that in extraordinary cases, adverse pretrial publicity may be so strong as to create a presumption of prejudice. (*People v. Prince*, *supra*, 40 Cal.4th at pp. 1216-1218 [discussing U.S. Supreme Ct. decisions].) This is not one of those extraordinary cases. Moreover, "[c]ontrary to defendant's claim, 'we cannot, as a general matter, simply disregard a juror's own assurances of his impartiality based on a cynical view of "the human propensity for self-justification." [Citation.]' " (*Id.* at p. 1219.) "Although the jurors' assurances of impartiality are not dispositive [citations], neither are we free to ignore them [citations]. We have in the past relied on jurors' assurances that they could be impartial. [Citations.] Absent a showing that the pretrial publicity was so pervasive and damaging that we must presume prejudice [citations], we do the same here." (*People v. Lewis* (2008) 43 Cal.4th 415, 450.)

At trial, in trying to show prejudice from the denial of a change of venue, defendant specifically referred to one actual juror whom defense counsel said he would have challenged peremptorily had he been able to do so. A review of the voir dire of that juror discloses no prejudice. That juror had heard of the case and had "figured they were guilty of something when they were caught and in the car that belonged to the deceased." But he also repeatedly assured the court he could set aside that opinion and judge the case solely on the evidence presented at trial. The trial court, who observed this voir dire, found the juror unbiased. We have no basis to disagree.

Moreover, when this juror stated the opinion that, given his understanding that defendants had been caught in the victim's car, they were guilty of

18

"something," he implicitly recognized that being guilty of *something* did not necessarily mean being guilty *as charged*. In this case, any juror would soon learn that defendant *had been* caught in the victim's car, and he *was* guilty of something. The evidence permitted no other conclusion. The only contested issue at trial was whether he was guilty of capital murder. Even if this juror had been incapable of setting aside his preconceived opinion — which the record shows was not the case — merely believing that defendant was guilty of something was a mindset that could not have prejudiced defendant.

"Here, our independent review of the record shows that the selection process resulted in a panel of jurors untainted by the publicity surrounding this case, and we see no evidence that any of them held biases that the selection process failed to detect." (*People v. Famalaro*, *supra*, 52 Cal.4th at p. 31.) "Considering all the circumstances, defendant has not established a reasonable likelihood, as opposed to a mere possibility, that he did not in fact receive a fair trial before impartial jurors." (*People v. Lewis*, *supra*, 43 Cal.4th at p. 450.) Stated slightly differently, we are confident the guilt and penalty verdicts were due to the evidence presented at trial and not to a biased jury or the failure to change venue.

## B. Jury Selection Issues

### 1. *Refusal to Excuse Prospective Jurors for Cause*

In a claim that to some extent reprises his argument regarding the change of venue issue, defendant contends the trial court erred in not excusing for cause 14 prospective jurors, either because they were "infected" by pretrial publicity or were "extremely partial" to the death penalty.

The qualification of jurors challenged for cause comes within the wide discretion of the trial court, seldom disturbed on appeal. (*People v. Horning*

19

(2004) 34 Cal.4th 871, 896.) To find a juror is actually biased, the court must find "the existence of a state of mind" regarding the case or the parties that would prevent the prospective "juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C); see *People v. Horning*, *supra*, at p. 896.) When a challenge is based on the prospective juror's views on the death penalty, the trial court must determine whether those views would prevent or substantially impair the performance of that person's duties. (*People v. Maury* (2003) 30 Cal.4th 342, 376.) " 'On appeal, we will uphold the trial court's ruling if it is fairly supported by the record . . . .' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114.) "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10.)

We see no abuse of discretion. All 14 of the jurors defendant cites assured the court they could be fair, could set aside any preformed opinions and decide the case based solely on the trial evidence, and, if the case were to go to a penalty phase, would consider either of the possible penalties — death or life without the possibility of parole. Some of them said things that would have supported a ruling excusing them for cause, but each also said things that supported the trial court's actual ruling. In that situation, we must defer to the trial court's determination of the jurors' state of mind.

Defendant argues the court should not accept statements from prospective jurors that they could be fair even though they had heard of the case and, in some instances, had formed opinions regarding guilt. As discussed in part II.A., *ante*, however, that is not the law. Most, or at least many, people recognize that what they read or hear in the media is not always absolute and complete truth, and are willing and able to judge a matter anew, for themselves, when they examine it

20

closely, as in a trial.  The court was careful to exclude prospective jurors who could not be fair and not to exclude those who could be fair.  That is exactly what it was supposed to do.

We will specifically discuss four of the prospective jurors defendant cites, three of whom became seated jurors.

(1)  One is the seated juror whom defense counsel had stated at trial he would have challenged peremptorily had he been able to do so.  As we discussed above in connection with defendant's change of venue contention (pt. II.A., *ante*), the record showed the trial court had a sufficient basis to conclude this juror was fair.

(2)  Another seated juror had heard of the case but had formed no opinion about it and said he could set aside what he had heard and decide the case solely on the evidence at trial.  He said that if the case went to a penalty determination, he "would want to hear the whole thing, complete," and that "if it warranted the death penalty, I could vote for that.  If it warranted life in prison, I could vote for that."  Later he said he favored the death penalty but would not automatically vote either way.  When defense counsel asked what he would do if it were proven beyond a reasonable doubt that there was a deliberate plan to kidnap and rob, and a deliberate killing during that kidnapping, he said he would lean towards death, but it would not be automatic.  When defense counsel asked if the leaning would be 95 percent, he responded, "Yeah, about there, I mean if it goes that far, whatever is premeditated, they thought about every single thing, whether someone died or not, it didn't matter to them, then, yes."

Based on this juror's response to defense counsel's "95 percent" question, defendant claims the juror "didn't want to hear any mitigating evidence before deciding the remaining 5%."  But the juror said no such thing.  Rather, when it became clear that he was being asked about his attitude toward mitigating

21

evidence, the juror confirmed that he would "listen to all of the evidence" and thoughtfully explained how mitigating evidence might indeed influence him. When asked whether evidence regarding defendant's childhood might have some weight in his mind, he answered, "I don't know about weight, but I can — but you could make me understand in my mind exactly what happened, you know, when you get to be an adult, you can't say, well, it was something as a kid, but it could have a lot to do with it." The record supports the court's ruling as to this juror.

(3) Another seated juror had heard of the case and formed the opinion that defendant "was guilty of something." When defense counsel asked, "did the fact that you heard [the publicity] tend to make you angry, upset, outraged over the crime," he responded, "Over the fact that she was murdered, yes." But he understood that he would have to base his decision on the evidence presented at trial and not on anything he may have read, and said, "I believe I can." He had no problem presuming defendant innocent despite the pretrial publicity he had read. When defense counsel asked whether his opinion that defendant was guilty of something would cause him to lean in favor of the prosecution, he responded, "Not at all." He said, "I don't think I would have a problem starting at ground level, just starting you know, like nothing happened." His opinion would not affect his determination of the case. He said, "I think the facts would speak for themselves." When defense counsel asked him whether defendant "might have to prove some things to you before say you find him not guilty," the juror responded, "I think he has to be proven guilty, not proven not guilty." He did not lean in favor of the death penalty and would consider both options.

Focusing on the juror's response to the question whether the publicity made him outraged, defendant claims his later statement that he could start at ground level was an "amazing assertion" and faults the trial court for, as he puts it, failing "to perform any credibility analysis." But there was nothing amazing about this

22

juror's responses.  When defense counsel asked a question about the publicity that seemed to invite an emotional response, the juror gave a careful, measured response, referring only to "the fact that she was murdered."  Anyone familiar with the case would be outraged by the fact the victim was murdered.  Such outrage does not mean anyone familiar with the case could not be a fair juror.  The record supports the trial court's ruling as to this juror also.

(4) One prospective juror, when asked whether she would always vote for the death penalty, responded, "I would vote on the circumstances of the case."  She had heard of the case, but said she could set aside what she had heard and decide the case based solely on the evidence presented in the courtroom.  She also expressed the view that the death penalty should be used more because "when someone repeatedly commits a crime and then gets put away just to serve out their sentence that it seems like a waste of taxpayers' money and space in the institutions for someone that is a repeat offender."  When defense counsel asked whether someone who murders should always get the death penalty, she responded, "I would believe that it would depend on the circumstances of how it came about that they killed them."  When pressed whether she would vote for death for a deliberate killing, she responded, "I think that it would depend on the facts surrounding why and what went on."  She would not automatically vote for death, although she would lean towards death.  Because defendant was in court, she believed that he "is probably guilty of something."  When the court explained the presumption of innocence and asked whether she could presume him innocent, she replied, "To be quite truthful, I don't know.  I have never done this before.  I would like to think that I'm a fair person, but I don't really know."  She also said that if she were asked to make a verdict without hearing evidence, she replied, "I am afraid that it would be guilty of something."  But later she also said that before she decided whether defendant was guilty, she would "want the information that is

23

going to tell me yes or no." If the evidence did not convince her that defendant was guilty beyond a reasonable doubt, she would vote not guilty. She later reiterated, "If the facts are there and they are good facts that prove that he is guilty, then I can judge that way. If the facts are there and there is not enough that . . . doesn't show that he's guilty, I can — believe I can vote 'not guilty' also."

The court denied defendant's challenge to this prospective juror, explaining, "I think that she has indicated that she would not automatically vote for death, that should be based on the circumstances of the case. As far as her feelings regarding the defendants having been guilty of something, she did indicate that she would base her decision in that regard on the evidence presented to her." Although the question whether to excuse this juror may have been close, it was one for the trial court, not this court, to decide. This juror's responses were equivocal and, perhaps, conflicting, but we see no basis on which to overturn the trial court's finding as to her actual state of mind.

We have reviewed the record regarding the other 10 jurors defendant cites. They were generally even less problematic than the four we have specifically discussed. The record supports each of the trial court's rulings.

### 2. *Excusing a Prospective Juror for Cause*

Defendant also contends the court erroneously excused one prospective juror for cause.

On the jury questionnaire, this prospective juror answered yes to the question whether he had any moral or religious beliefs that would affect his ability to be a juror, and he wrote, "The Bible tells us not to judge." Regarding the death penalty, he wrote, "I think if it's in place then it's up to the Courts to do as they see fit." He answered no to the question whether he felt the death penalty is

24

wrong for any reason and checked the box stating he would have no problem voting for the death penalty in an appropriate case.

During voir dire, the prospective juror said that he is an associate pastor of a church. He would have difficulty sitting as a juror because of his beliefs that one should not judge other people. If he were forced to remain on the jury, it would be "hard" to ignore any religious beliefs he may have. He said, "As far as I'm concerned, I would have a hard time standing in judgment of somebody, to be honest with you, to tell you the truth." When asked about his answer that he did not believe the death penalty is wrong, he said, "When I did that, it took me about two hours to go through that thing, and because of the way I . . . am to go along with the laws of the land. And if the laws of the land said that there is a death penalty, then I can't argue with that. As far as my own personal belief, it is up to what the jury and the judge rule, that is the last thing, and — as far as that goes. If they said — like we said earlier, if somebody said that it was the death penalty, then I would have to go along with the law as far as the law goes, but I may not agree with it totally." He then said that he would apply the death penalty if it was the law of the land.

When asked further whether he could judge someone, he responded, ""[O]ne side of me says no, one side says yes. The reason I say that is because my heart says no, but then there is a part of me that says, you know, if somebody is guilty of something, you know, it is a hard decision to make. But if the evidence proved it, and that is what warranted, then I would — I don't know. I may be the one that would be the off balance to that. I would probably say no and everybody else would say yes, if that was the case. I may be the off balance to it. I don't know. I would have to cross that bridge. It is a hard decision. Matthew, quoting it, said 'Judge not, lest you be judged.' That is the whole thing. I don't know if I could say yes, death." When asked again whether he could judge someone, he

responded, "If I was picked for a jury and I had to do that, yes, I would have to do that. I have to obey the laws of the land. It is like going 55 miles an hour down the road. See what I am saying? You have to do that. Like I said, it would be hard, it would be the hardest thing that I would ever have to do." He said he would "[t]ry to do it, yes, sir, if I had to. If I was forced into that position, yes, I would try to do that."

When one of the defense attorneys asked whether he could decide guilt or innocence, he responded, "That is something that I would have to work through. I can't answer that now because I haven't seen the full scale of how, you know. It is like anything else, it takes time, you know, if — if I had to separate it, I believe that I could, because I'm open to it. I'm not going to say, you know, that I couldn't because I am open to pushing it a — pushing it aside if that is the case that — if that is what they want me to do, I will do that." The court asked whether, if he were forced to stay on the jury and make a judgment, he believed he would later have to ask God's forgiveness for having done that, he responded, "To be honest with you . . . , yes, I would, in my heart . . . ." He would feel that he had violated his religious beliefs.

Defendants objected to excusing the prospective juror, arguing, "He may be reluctant, but he indicated that he would go ahead and do what he had to do in respect to judging his fellow man and also in respect to the death penalty." The court excused the prospective juror. It explained, "I don't know that the law would require that someone violate a precept of their religious beliefs, even though this man presumably was willing to do that if I ordered him to do that, but — but I think that it is . . . cause."

Defendant contends the court erred. He argues that the juror's views on the death penalty did not warrant his excusal. It does not appear, however, that the court excused him due to those views. Indeed, the juror stated on the jury

questionnaire that he did not oppose the death penalty. Rather the court excused the juror because his religious beliefs would have prevented or substantially impaired his ability to sit in judgment.

A person's religious views might support an excusal for cause. (See *People v. Russell* (2010) 50 Cal.4th 1228, 1263.) More specifically, "religious convictions preventing a juror from rendering a verdict amount to good cause for that juror's dismissal." (*U.S. v. DeCoud* (9th Cir. 2006) 456 F.3d 996, 1016 [upholding excusal during jury deliberations].) *State v. Tucker* (S.C. 1999) 512 S.E.2d 99 is quite close on point. The prospective juror there was a Jehovah's Witness minister. "A general tenet of Jehovah's Witnesses is that they can not sit in judgment of another person." (*Id.* at p. 103.) When asked by defense counsel, the juror had "said he thought that there was some counseling which might enable him to serve as a juror but the counseling might take four days." (*Id.* at p. 104.) The trial court excused the juror based on "the fact that his religious beliefs would not allow him to sit as a juror and that the special circumstances which might allow him to serve would require four days of counseling." (*Ibid.*) Under these circumstances, the South Carolina Supreme Court concluded that the "trial court properly excluded [the prospective juror] because his religious beliefs which prohibit judging another person would have prevented or substantially impaired the performance of his duties as a juror." (*Ibid.*)

We reach a similar conclusion here. This juror could hardly have been more equivocal about whether he could set aside his religious convictions and perform a juror's duties. The trial court did not excuse him because he belonged to any particular religious denomination, or even because he had any particular religious beliefs. Rather it excused him because he made it clear that his beliefs would have substantially impaired the performance of his duties as a juror. Prospective jurors whose beliefs — whether religiously or otherwise based —

prevent them from impartially performing the duties of a juror, which includes deciding the case impartially and, ultimately, sitting in judgment, may be excused for cause.

Defendant argues the court did not excuse him because his religious views impaired his ability to be a juror but because it believed the law did not require someone to violate a religious belief even if capable of doing so. While it is true the court did not articulate its reason for excusing the juror in terms of the precise standard, the record clearly shows that this juror would have been substantially impaired in the performance of his duties. The juror expressed numerous doubts about his ability to judge someone. He said that if picked as a juror, he would try to do so. But he also explained that one side of him said he could judge someone and another side said he could not. He would feel that he had violated his religious beliefs, for which he would have to ask God's forgiveness. These statements supported excusing the juror for cause.

Defendant argues that to uphold the excusal here "would be to bar the followers of any religion which opposes capital punishment from serving in capital cases," which, he further argues, includes a high percentage of the general population. We disagree. It is no doubt common for prospective jurors, or even sitting jurors, to believe, and perhaps to state, that sitting in judgment in a capital case would be difficult or even one of the hardest things they have been asked to do. But that is not why this particular prospective juror was excused. He was not excused because he believed judging someone would be difficult. Instead, he was excused because he said it would be very hard for him to ignore his belief system in order to carry out his duties as a juror. This internal conflict, not the inherent

28

difficulty of sitting in judgment, is what may render a prospective juror, including this one, excusable. We see no error.

### C. Guilt and Special Circumstance Issues

#### 1. Admitting Defendant's Confessions

Defendant contends the trial court erred in admitting his confessions. We disagree. As the trial court found, both of defendant's confessions were preceded by full admonitions under *Miranda v. Arizona* (1966) 384 U.S. 436, and defendant waived his rights. At trial, defendant argued that "because of the age of the defendant, 23, and because of the seriousness of the offense, that in order to make a knowing and intelligent waiver, he should have been advised that it, in fact, was a death penalty case." He renews that argument here. The claim that the police had to inform defendant that he faced the death penalty lacks merit. (*People v. Sanders* (1990) 51 Cal.3d 471, 512-513.) Additionally, nothing about defendant's age prevented him from validly waiving his rights and talking to the police.

#### 2. Redacting Defendant's Confessions to Delete Mention of the Codefendant

Before trial, both defendants moved for separate trials. Defendant Rountree, but not Stroder, had confessed. Defendant's confession was admissible against him but not against Stroder. To avoid prejudicing Stroder, the prosecution sought to present a version of defendant's confession redacted to delete any reference to Stroder. Defendant objected. He argued that changing his confession in this way would distort its meaning because, as his attorney stated rather colorfully, the proposed redaction "ain't the way it happened." The court denied the severance motion without prejudice.

During trial, defendant raised the point again. He argued that the redacted version "does not accurately reflect what actually happened, and it works to

29

[defendant's] prejudice." Citing *People v. Douglas* (1991) 234 Cal.App.3d 273, he also argued that under Evidence Code section 356, he would be entitled to elicit the rest of the confession. For these reasons, defendant renewed his motion for severance or, in the alternative, he moved for a mistrial. The court denied the motions. Later, before the jury heard about defendant's confessions, the court and parties went over the redacted statements point by point. The court permitted defendant to state all his specific objections and to indicate what portions of the unredacted statement he wished to elicit on cross-examination. Ultimately, the jury heard the redacted version of defendant's confessions summarized in part I, *ante*. Defendant was not allowed to cross-examine Deputy Giuffre regarding, or otherwise introduce, the unredacted version.

Defendant contends the court erred in admitting the redacted version of his confession. When the prosecution seeks to introduce a defendant's extrajudicial statement that implicates a codefendant but is inadmissible against that codefendant, one option the trial court has is to "permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted *without prejudice to the declarant*." (*People v. Aranda* (1965) 63 Cal.2d 518, 530, italics added.) As the italicized language from *Aranda* indicates, if the state uses a criminal defendant's words against him, it must not change those words to the defendant's prejudice. (See *People v. Lewis*, *supra*, 43 Cal.4th at p. 457; *People v. Douglas*, *supra*, 234 Cal.App.3d 273.) "A defendant is prejudiced in this context when the editing of his statement distorts his role or makes an exculpatory statement inculpatory." (*People v. Lewis*, *supra*, at p. 457.)

We have compared the redacted statements with the unredacted statements, and we find no difference that could have prejudiced defendant at the guilt phase. Defendant's role was not distorted and no exculpatory statement was rendered inculpatory. Rather, all mention of Stroder and what defendant said she did was

30

simply deleted in the redacted version the jury heard.  On many occasions, the word "we" (referring to both defendant and Stroder) was changed to "I."  Doing so risks impliedly overstating the declarant's personal role.  (See *People v. Lewis*, *supra*, 43 Cal.4th at p. 457; *People v. Tealer* (1975) 48 Cal.App.3d 598, 603-604.)  But it did not do so in this case.  Defendant confessed to being a major participant in the victim's kidnapping and robbery and to being the actual gunman.  His confession showed that he was personally guilty of the charged crimes.  The redacted statements contained no suggestion that defendant might have done something that he attributed to Stroder.  The jury simply did not hear of whatever acts defendant attributed to her.

If anything, the redaction might have benefited defendant at the guilt phase.  Defendant argues in this court that the evidence was insufficient to support the kidnapping conviction because there was no evidence Diana entered the car nonconsensually.  As we explain in part II.C.4., *post*, the contention lacks merit.  But the unredacted statement would have supplied the evidence defendant claims was missing.  One portion of the confession that was deleted was defendant's statement that Stroder had told the victim, " 'Please get in the car.  My boyfriend's got a gun and we need some money,' " and that the victim then "got scared and got in the car."  All the jury heard about this was that defendant admitted the victim was not in his car voluntarily.  Contrary to defendant's argument, what the jury heard did not suggest defendant acknowledged doing something he attributed to Stroder.  But what the jury did *not* hear was exactly how and why the victim entered the car.  Deleting that portion of his statement could not have prejudiced defendant.

Defendant contends that admitting the redacted version, and prohibiting him from cross-examining Deputy Giuffre regarding the rest of the statements, violated both Evidence Code section  356 and his right to confront and cross-

31

examine witnesses.  Evidence Code section 356 provides, "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . ."  "But limits on the scope of evidence permitted under Evidence Code section 356 may be proper when, as here, inquiring into the 'whole on the same subject' would violate a codefendant's rights under *Aranda*[, *supra*, 63 Cal.2d 518] or *Bruton* [*v. United States* (1968) 391 U.S. 123]."  (*People v. Lewis*, *supra*, 43 Cal.4th at p. 458.)  As in *Lewis*, "the trial court precluded defendant only from bringing out his own hearsay statements that expressly inculpated his codefendant[].  These limits were permissible notwithstanding Evidence Code section 356."  (*Ibid*.)  For similar reasons, the limitation did not violate defendant's right to confront and cross-examine witnesses.  (*Id*. at p. 459.)

*People v. Douglas*, *supra*, 234 Cal.App.3d 273, which found that the redaction of that case had prejudiced the declarant, does not aid defendant.  In *Douglas*, the trial court permitted the redaction without considering whether it would have prejudiced the declarant.  (*Id*. at p. 282.)  Here, the court considered both the actual statements and the suggested redaction to determine whether the redaction would prejudice defendant.  More importantly, in *Douglas*, much of the unredacted statements were exculpatory, as the declarant had *denied* being the direct perpetrator.  Two knives had been used in the crime of that case.  The declarant denied using either one.  The redacted statement the jury heard, however, implied that the declarant had said that he and a codefendant had "each used a knife in the attack on [the victim].  The jury was not told that [the declarant] repeatedly denied using either knife."  (*Id*. at p. 284.)  Thus, in *Douglas*, "the deletion of references to [a codefendant] in appellant's statement clearly, and inaccurately, implied that appellant admitted his involvement in conduct he had explicitly disclaimed.  Appellant was then improperly prevented from presenting

evidence that his actual statement was exculpatory on major points. The prejudice to him is obvious and serious." (*Id*. at p. 287.)

Here, by contrast, what defendant said Stroder had done was simply deleted in the redacted version the jury heard. There was no implication defendant did anything he denied doing. Nothing exculpatory was excluded from the version the jury heard. Defendant was not prejudiced at the guilt phase. (We will consider defendant's further argument that he was prejudiced at the penalty phase in pt. II.D.1., *post*.)

### 3. Admission of Photographs

Before trial, the prosecution sought to introduce in evidence photographs of the victim taken at the crime scene and at the autopsy. Both defendants objected. Defendant argued that the photographs were more prejudicial than probative because he had "admitted almost every element [of] the prosecution's case in the statement." The prosecutor argued that the photographs were relevant on the question of premeditation. After viewing the photographs, the court excluded one as cumulative and admitted the others. It found the photographs to be probative and "not so gruesome so . . . that there is really any serious danger that they will inflame the jury." It weighed the probative value against what it found to be a "minimal prejudicial effect." The court reiterated its ruling when defendants renewed their objection during trial.

Defendant contends the court erred. The admission into evidence of photographs lies within the trial court's discretion and will not be disturbed absent an abuse of that discretion. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1271-1272.) Here, the trial court carefully exercised its discretion. We have reviewed the photographs and find no abuse of that discretion. As the court found, they are not particularly gruesome, as autopsy photographs go. In any event, because

33

murder is rarely pretty, photographs in a murder case are generally unpleasant. (*People v. Gerule* (2002) 28 Cal.4th 557, 624.) The photographs were highly probative. By showing the condition of the body and the direction of the bullets, for example, they helped show that defendant shot the victim first while she was standing and then two more times after she fell to the ground. This, in turn, was relevant to show premeditation. We have consistently upheld the admission of autopsy photographs disclosing how the victim was wounded as being relevant to the question of deliberation and premeditation, as well the appropriate penalty. (*People v. Gonzales*, *supra*, at p. 1272.)

Defendant argues the photographs were not relevant because, he claims, they did not show anything that he disputed. For example, he admitted he shot the victim while she was lying on the ground. But even so, the prosecution may still prove its case. Defendant cannot prevent the admission of relevant evidence by claiming not to dispute a fact the prosecution is required to prove beyond a reasonable doubt. The jury was entitled to learn that the physical evidence, including photographs, supports the prosecution's theory of the case. (*People v. Scheid* (1997) 16 Cal.4th 1, 16.)

Defendant also claims the photographs were prejudicial at the penalty phase. On the contrary, the penalty phase is an especially appropriate time to introduce photographs showing exactly what the defendant did. Indeed, photographs that have been excluded as too gruesome at the guilt phase may be introduced at the penalty phase. (*People v. Moon* (2005) 37 Cal.4th 1, 34-35.) "The photographs demonstrated the real life consequences of defendant's crimes and pointedly made clear the circumstances of the offenses . . . ." (*Id*. at p. 35.) We see no error.

34

### 4. Sufficiency of the Evidence

Defendant contends the evidence was insufficient to support the kidnapping conviction because it did not show that the movement was nonconsensual. To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt. (*People v. Story* (2009) 45 Cal.4th 1282, 1296.) The evidence here was ample.

To constitute kidnapping, "the victim's movement must be accomplished by force or any other means of instilling fear. . . . [T]he force used against the victim 'need not be physical. The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances.' " (*People v. Majors* (2004) 33 Cal.4th 321, 326-327.)

Because defendant's confession was redacted to delete any mention of Stroder, the jury heard no direct testimony about exactly how and why Diana entered defendants' car. (See pt. II.C.2., *ante*.) But the jury did hear defendant's statements in his first confession that the gun was partly in his lap and that the victim did not enter the car voluntarily, and his statements in his second confession that the victim looked down where the gun was sitting, and he told her, " 'I don't want to hurt you. I just want some money.' " This alone was sufficient evidence. As the prosecutor aptly argued to the jury, "A person who gets into the car with two total strangers because those people are armed with a weapon is not acting freely and voluntarily."

Additionally, defendant's statements were far from the only evidence before the jury. Diana was supposed to babysit at her sister's house that afternoon,

but she never appeared. Evidence showed that she disclosed her PIN to defendant and was with him when he withdrew $100 from her account, acts a jury could reasonably conclude were not consensual. The evidence showed that defendant did, in fact, have a rifle, which he eventually used to kill her. Under the circumstances, the jury could reasonably infer that he had used the rifle earlier to kidnap her and coerce her into disclosing her PIN. Moreover, even if, hypothetically, the victim had originally entered the car voluntarily, defendant was still guilty of kidnapping if he compelled her to go further than she wanted to go. (*People v. Alcala* (1984) 36 Cal.3d 604, 622.) A reasonable jury could reject the possibility that Diana voluntarily accompanied defendants from the Valley Plaza mall in Bakersfield to the location over 30 miles away where defendant killed her. The evidence fully supports the verdict.

### 5. *Instructional Claims*

Defendant contends the court's instructions to the jury were erroneous in several respects.

First, he contends the trial court had a sua sponte duty "to instruct the jury that an accidental act resulting in death during the course of a felony fails to meet the requirements of the felony-murder special circumstances."

The felony-based special circumstances do not require that the defendant intend to kill. It is sufficient if the defendant is the actual killer or either intends to kill or "with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission" of the felony. (§ 190.2, subd. (d); see *People v. Estrada* (1995) 11 Cal.4th 568, 575.) Additionally, for the special circumstance to apply, the felony must not be merely incidental to the murder. "[I]f the felony is merely incidental to achieving the murder — the murder being the defendant's primary purpose —

36

then the special circumstance is not present, but if the defendant has an 'independent felonious purpose' (such as burglary or robbery) and commits the murder to advance that independent purpose, the special circumstance is present." (*People v. Navarette* (2003) 30 Cal.4th 458, 505.)

The court instructed the jury on these requirements. Regarding the point that the robbery must not be incidental to the murder, the court instructed that the jury had to find the "murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder." The court gave a comparable instruction regarding the kidnapping-murder special circumstance. (See CALJIC No. 8.81.17; *People v. Stanley* (2006) 39 Cal.4th 913, 956-957.) These instructions were sufficient. There are no additional legal requirements regarding whether a given killing might be considered to be accidental or not.

Defendant cites language in which we said that the "felony-murder special circumstance requires that the 'defendant [must] commit[] the act resulting in death in order to advance an independent felonious purpose.' " (*People v. Berryman* (1993) 6 Cal.4th 1048, 1088, quoting *People v. Bonin* (1989) 47 Cal.3d 808, 850.) He draws from this language an intent-to-kill requirement, arguing that if the defendant did not intend to kill, he cannot have killed in order to advance an independent felonious purpose. We disagree. Neither *Berryman* nor *Bonin* added any requirement beyond those stated in CALJIC No. 8.81.17. "The only intent required to find the felony-murder-robbery special circumstance allegation true is the intent to commit the robbery before or during the killing." (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) The instructions the court gave correctly and fully

37

instructed the jury on the requirements of the special circumstances. No additional instructions were required.

Second, defendant contends the court erred in not instructing the jury on the lesser included offense of voluntary manslaughter based on heat of passion. A trial court has a sua sponte duty to instruct on lesser included offenses, such as voluntary manslaughter, that find "substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) A killing committed in a heat of passion on sufficient provocation is voluntary manslaughter. (*People v. Jackson* (1980) 28 Cal.3d 264, 305.) Based on what he had said about his interactions with the victim shortly before he shot her, defendant argues that the jury could have found that when he killed her, he had become "overly excited or provoked," thus warranting manslaughter instructions. We disagree.

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. . . . '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances' . . . ." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) In this case, the subjective component is missing. There is no evidence, and defendant's confession supplies none, that he killed in the heat of passion. He claimed the first shot was an accident, not a killing in the heat of passion. The objective component is also missing. "No case has ever suggested . . . that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter." (*People v. Jackson*, *supra*, 28 Cal.3d at p. 306.)

Defendant also reiterates several contentions we have repeatedly rejected. We see no reason to reconsider our previous decisions. The court properly instructed the jury on first degree murder even though the information did not specifically allege the charged murder was in the first degree. The information did allege that the murder was premeditated and committed under both robbery and kidnapping special circumstances, thus providing defendant with ample notice of the charge of first degree murder. (*People v. Valencia* (2008) 43 Cal.4th 268, 289.) The court did not have to require the jury to agree unanimously whether defendant was guilty of first degree murder on a premeditation or felony-murder theory. Moreover, the jury found both of the felony-based special circumstances true, showing it agreed he was guilty of first degree murder on at least a felony-murder theory. (*Ibid*.) The court did not err in instructing the jury it could not convict defendant of second degree murder unless it unanimously acquitted him of first degree murder. (*People v. Nakahara* (2003) 30 Cal.4th 705, 715.) Finally, various of the standard guilt-phase instructions did not undermine the requirement that the prosecution has the burden of proof beyond a reasonable doubt. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1169.)

### 6. *Validity of Felony-based Special Circumstances*

Defendant contends the felony-based special circumstances as this court has interpreted them are constitutionally infirm. They are not. (*People v. Morgan* (2007) 42 Cal.4th 593, 622; *People v. Beames* (2007) 40 Cal.4th 907, 933-934; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1265-1266.)[3]

---

[3] Defendant also asserts generally, and without elaboration, that he did not receive the effective assistance of counsel. But he states he will raise the specific claims in a petition for writ of habeas corpus. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.) Accordingly, we do not consider the claim here.

### D. Penalty Issues

#### 1. Effect on the Penalty Determination of Redacting Defendant's Confessions

Defendant contends admitting the redacted version of his confessions prejudiced him at the penalty phase. (See pt. II.C.2., *ante*.) This question was litigated at trial after the guilt verdict. Claiming he would be prejudiced if he could not present the entire unredacted statement at the penalty phase, defendant renewed his motion for severance, which the court denied. The court permitted defendant to call Deputy Giuffre, who interviewed defendant both in Kansas and in California, as a witness in mitigation. Deputy Giuffre testified that defendant was fully cooperative and willing to answer any questions when the deputy spoke with him, and that defendant was crying during the interview in Kansas.

Defendant argues that "the redacted statements presented a picture of the crime that was essentially false because it showed [him] as the sole planner and perpetrator of the crime." But the redacted statement did not distort anything or overstate defendant's role. It is true that the jury did not hear of any actions defendant attributed to Stroder — the chief of which was that she told the victim to get in the car because her " 'boyfriend's got a gun and we need some money' " — but there was no suggestion defendant played a bigger role than he did. Moreover, the jury knew defendant had not acted alone. It also convicted Stroder of Diana's murder. "[A]lthough defendant's edited statements excluded references to his codefendants, it is evident the jury did not believe defendant had acted alone, for it found at least one of his codefendants guilty along with him in each set of crimes to which he confessed." (*People v. Lewis*, *supra*, 43 Cal.4th at p. 457.) The same is true here except that here there was only one codefendant and one set of crimes.

Defendant also argues that some parts of his confessions that the jury did not hear were mitigating.  Specifically, he cites a statement in which he said that he and Stroder had gotten married because he knew he would go to jail, and he thought that being married would allow them to keep in contact; and that he wanted to drive to St. Louis where he "could get her  home" and turn himself in.  But to the extent this statement could be considered mitigating, it was also hearsay.  Including such portions was not necessary to make sense of the statements that were admitted.  The court merely precluded defendant from bringing out his own hearsay statements that involved his codefendant.  "These limits were permissible notwithstanding Evidence Code section 356."  (*People v. Lewis*, *supra*, 43 Cal.4th at p. 458.)

Moreover, any mitigating tendency in the unredacted statements was trivial in light of the case as a whole.  This is especially true when the statement defendant mainly cites is viewed in context.[4]  Defendant described Stroder as being scared and "more a victim . . . than a suspect" and indicated that she " 'didn't do nothing.' "  These portions of the statement were hardly mitigating.

---

[4]     The statement responded to the question of why defendant had gotten married.  The entire answer was, "Cause I knew I was going to jail, I guess.  She was scared.  She didn't know what was going on, you know.  She pretty much relied on me.  She didn't, you know, she's pretty much more a victim, you know, than a suspect.  She was — didn't know what was gonna happen, she was scared you know.  She asked if she's gonna go to jail?  I said, 'Well, you're with me, I guess they'll probably try to get you to go to jail, but you didn't do nothing but you're not running to the cops either, you know you've got your choice, you know.'  It's like (inaudible) I said, we could turn ourselves in cause I (inaudible) drive back to St. Louis and I was gonna turn myself in then.  Just to get her home and try to somehow get her out of it.  Never made it, though.  Cause we got married, I guess, cause we were going to jail.  I wanted to be able to keep in contact."

Not allowing the jury to hear this statement did not prejudice defendant under any standard.

### 2. *Admission of Victim Impact Evidence*

Over objection, the court permitted the prosecution to present the testimony of the victim's sister, her father, and a friend about the victim and the impact of her death. Through the sister, the prosecution presented a series of photographs of the victim at various stages of her life. Defendant contends the court erred in admitting this evidence. We disagree.

"Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056-1057; see *Payne v. Tennessee* (1991) 501 U.S. 808.) The evidence here came well within permissible limits. The entire testimony of all three witnesses consumed just over 11 pages of the reporter's transcript, a small fraction of the time devoted to defendant's case in mitigation. It was not unduly inflammatory and "was very typical of the victim impact evidence we routinely permit." (*People v. Valencia*, *supra*, 43 Cal.4th at p. 300.) Admitting the series of still photographs also came within the court's discretion. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 365-368 [upholding admission of a 14-minute videotaped montage of photographs].)

### 3. *Excluding Evidence of the Victim's Family's Opinion Regarding Penalty*

Believing that members of the victim's family did not wish the defendants to receive the death penalty, defendant sought to present their testimony to that effect. The court ruled that the victim's family's views regarding the proper punishment was inadmissible. Defendant argues the court erred. It did not err. The views of the victim's family regarding the proper punishment — either

way — are not relevant either in mitigation or in aggravation. (*People v. Lancaster* (2007) 41 Cal.4th 50, 96-99; *People v. Smith* (2003) 30 Cal.4th 581, 622-623.)

### 4. *Propriety of the Prosecutor's Penalty Phase Jury Argument*

Defendant contends three portions of the prosecutor's penalty phase argument to the jury were improper. He objected to no part of that argument. Accordingly, and with one exception, he has forfeited the right to complain on appeal. At the time of trial in 1995, no objection was required to raise the claim that the prosecutor impermissibly tried to minimize the jury's responsibility for its penalty decision under *Caldwell v. Mississippi* (1985) 472 U.S. 320. Accordingly, defendant may make that argument in this case. But other arguments of misconduct are forfeited. (*People v. Leonard*, *supra*, 40 Cal.4th at pp. 1416-1417; see *People v. Cleveland* (2004) 32 Cal.4th 704, 762 [requiring an objection in future cases to preserve a claim of *Caldwell* error].)

In any event, we see no impropriety, which probably is why defense counsel did not object. Defendant first complains of this argument: "[C]apital punishment is merely society's expression of the moral outrage of particularly offensive conduct, and the discussion of capital punishment might be appropriate in an extreme case such as what we have in this case is the expression of society that some crimes are so egregious that they are deserving of the ultimate penalty, which is the penalty of death. That's the only adequate response to this affront to humanity." He claims this was an improper argument "that society's 'revulsion' for grave crimes required imposition of the death penalty." On the contrary, the prosecutor argued that the death penalty was appropriate in an extreme case such as this one. Defendant was entitled to argue, and did argue, the opposite, and the jury then had to choose; but we see nothing wrong with this argument.

Defendant also claims the prosecutor improperly contrasted his life in prison with "the victim in her grave." The prosecutor compared defendant's life in prison with the victim's inability to enjoy any of life's experiences. The argument was not unduly inflammatory or otherwise improper. Defendant also claims some of the prosecutor's argument concerning the victim "was an inflammatory call for vengeance." It was not. It was an appropriate discussion of the victim impact evidence. "Considerable leeway is given for appeal to the emotions of the jury as 'long as it relates to relevant considerations.' " (*People v. Benavides* (2005) 35 Cal.4th 69, 108.) The argument here came well within that leeway. The prosecutor also asked the jury to "show the same mercy that they [defendants] showed for Diana Contreras which was none at all." The argument was proper. (*People v. Benavides*, *supra*, at pp. 108-109.)

We have reviewed the prosecutor's entire argument. It was forceful but was limited to legally relevant factors. Regarding the only claim that is cognizable on appeal, the prosecutor never said anything remotely minimizing the jury's responsibility for its penalty decision. On the contrary, she emphasized to the jury, "You are the people who decide if they crossed that line drawn by society, and that's a heavy responsibility." The jury argument was not improper under *Caldwell v. Mississippi*, *supra*, 472 U.S. 320, or anything else.

### 5. *Refusal to Give a Special Instruction*

The trial court refused defendant's request to give a special instruction that a "single mitigating factor is sufficient to support a decision against death." Defendant contends the court erred. It did not. The court gave CALJIC No. 8.88, the standard instruction concerning the weighing process the jury undertakes at the penalty phase. That instruction "accurately describes how jurors are to weigh the aggravating and mitigating factors." (*People v. Elliot* (2005) 37 Cal.4th 453, 488.)

44

"As we have repeatedly explained, the standard jury instructions the court gave in this case 'are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.' [Citations.] No additional instructions were required." (*People v. Kelly* (2007) 42 Cal.4th 763, 799 [rejecting argument the court had to give an instruction similar to the one defendant requested]; see *People v. Smith*, *supra*, 30 Cal.4th at p. 638; *People v. Jones* (1998) 17 Cal.4th 279, 314.)

### 6. *Effect of Guilt Phase Error and Cumulative Prejudice*

Defendant contends the cumulative effect of the asserted guilt and penalty phase errors was prejudicial. However, there was no error to accumulate.

### 7. *Claim that the Death Sentence Is Disproportionate*

Defendant makes two distinct, although related, arguments that the death penalty in this case is disproportionate. First, he argues that any death judgment based solely on felony-based special circumstances is unconstitutional. It is not. As noted above (pt. II.C.6., *ante*), felony-based special circumstances are valid. Moreover, the death penalty in this case was not entirely due to the special circumstance findings. The special circumstances made defendant death *eligible*. But California's death penalty law is not mandatory. Rather, after hearing the penalty phase evidence, the jury must choose either the death penalty or life without the possibility of parole based on a weighing process and consideration of the aggravating and mitigating factors. (§ 190.3.) The fact that defendant committed a murder under the felony-based special circumstances is not all that the jury considered in reaching its death verdict. Rather, it considered all the evidence, including the "circumstances of the crime." (§ 190.3, factor (a).)

Second, defendant contends that the death sentence is disproportionate — i.e., cruel and unusual — as applied to him. When a defendant contends the death

45

sentence is cruel and unusual as applied, the reviewing court must determine whether the penalty is grossly disproportionate to the defendant's individual culpability or shocks the conscience and offends fundamental notions of human dignity. In making this determination, the court examines the circumstances of the crime — including motive, the extent of the defendant's involvement, the manner in which the crime was committed, and the consequences of the defendant's acts — as well as the defendant's personal characteristics, including age, prior criminality, and mental capabilities. (*People v. Hines* (1997) 15 Cal.4th 997, 1078.)

Defendant bases his argument on his own relatively benign version of how and why he killed Diana Contreras. Citing his confession, defendant argues the killing came about this way: "After using her card to take $100 from an ATM, [he and Stroder] tried to leave Contreras in a remote area to give themselves a headstart, but she argued with them and [defendant's] rifle accidentally discharged, striking Contreras. [Defendant] then panicked and fired twice more to stop her pain." In effect, defendant argues that the first shot was an accident and the second and third shots were a mercy killing.

But the jury did not have to accept defendant's version of the events. It could reasonably have found the crime was, as the prosecutor argued, a "cold-blooded, planned murder." When it denied the automatic motion to modify the verdict, the trial court stated it was "not at all convinced that this was an accidental killing or an accidental discharge of a first shot." It explained that "unless the shooter intended to use the firearm there was very little reason for that gun to be outside the vehicle in the possession of the shooter. I am not convinced that the defendant's conduct immediately following the killing is indicative of remorse at all, given . . . the timetable involved in this case, of the withdrawals that were made immediately after the abduction and then the withdrawals that were on . . .

46

videotape. It would appear that the first thought was not remorse but rather to take advantage of items that were taken from the victim." The court concluded "that the jury having heard the evidence and obviously from their decision in this matter agreed with the court's estimation. And I agree with their conclusion in this matter." The evidence strongly supports the trial court's view of the evidence. (See *People v. Bennett* (2009) 45 Cal.4th 577, 628-629 [citing trial court's description of the crime in rejecting argument the death sentence was disproportionate].)

Diana Contreras was of no possible threat to defendant. If, as he claimed, he had merely wanted to drop her off in a remote area so he would have a head start in escaping, he could simply have forced her out of his car and driven away. There was no need for him to get out of the car, and certainly not with the rifle. The jury could reasonably have concluded that defendant's getting out of the car with his rifle showed that he intended to use it. The jury could also have rejected as incredible defendant's claim that the no-doubt-terrified victim wanted to get back into the car with him and his rifle after he dropped her off. Although the area where defendant shot her was rather remote and far from her home, it was also near one road and less than two miles from another, busier, road. Deliverance would not be far away, especially given that it was still early in the day. The jury could find it inconceivable the victim wanted to continue her contact with defendant. Additionally, the jury could reasonably have rejected defendant's claim that the gun discharged accidentally — either because of his victim's aggressive actions or because he "twitched" at the wrong moment — especially given the six pounds of pressure needed to pull the trigger and the fact the gun had to be cocked and the safety depressed for it to fire.

Defendant *said* that he was scared and did not know what to do after he killed her, and that he parked back in town and cried. But his *actions* belie his

47

words, or so the jury could reasonably have concluded. The jury could reasonably have concluded that he knew exactly what to do. As shown in the videotape, he used the victim's ATM card to withdraw money shortly after killing her. He also switched cars and left the area in the victim's car. He used the victim's ATM card repeatedly over the next few days to finance his trip east. It was only *after* he was caught that he expressed remorse.

The physical evidence showed that defendant shot Diana from pointblank range while she was standing, then two more times after she fell to the ground. The jury could reasonably have concluded that defendant intentionally shot her from close range, then applied the coup de grace with two more bullets into her supine body to ensure that she died. It could reasonably have concluded defendant committed an execution-style killing designed to leave behind no witness who could identify him.

Nothing about defendant's personal characteristics makes the death sentence cruel and unusual. As he argues, his criminal record was relatively minor and nonviolent. Thus, his prior criminality was a fairly minor factor in aggravation. But it is hardly a significant factor in *mitigation*. The sentence defendant received is not disproportionate to his personal culpability. It does not shock the conscience.

### 8. *Other Claims*

Defendant reiterates various claims that we have repeatedly rejected. We see no reason to reconsider our previous decisions.

Intercase proportionality review is not required. (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1180. (As noted in pt. II.D.7., *ante*, we do provide *intracase* proportionality review, but such review does not aid defendant.) Section 190.2 is not impermissibly broad. (*People v. Beames*, *supra*, 40 Cal.4th at pp.

48

933-934.) Section 190.3, factor (a) (circumstances of the crime) is not applied too broadly and does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Livingston*, *supra*, at pp. 1179-1180; *People v. Beames*, *supra*, at p. 934.) "Except regarding evidence of other crimes, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required." (*People v. Livingston*, *supra*, at p. 1180.) CALJIC No. 8.88's use of the words "so substantial," its use of the word "warrants" instead of "appropriate," its failure to instruct the jury that a sentence of life is mandatory if mitigation outweighs aggravation, and its failure to instruct the jury on a "presumption of life" does not render the instruction invalid. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1179; *People v. Moon*, *supra*, 37 Cal.4th at p. 43.) Section 190.3's use of adjectives such as "extreme" and "substantial" in describing mitigating circumstances does not impermissibly limit the jury's consideration of mitigating factors. (*People v. Beames*, *supra*, at p. 934.) The court need not delete inapplicable sentencing factors or instruct that statutory mitigating factors are relevant solely in mitigation. (*People v. Rogers*, *supra*, at p. 1179; *People v. Beames*, *supra*, at p. 935.) "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently." (*People v. Livingston*, *supra*, at p. 1180.) "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511.)

Defendant makes one constitutional argument that appears to be new. As noted, we have repeatedly rejected the argument that the death penalty law violates equal protection by treating capital and noncapital defendants differently. In addition to repeating that challenge, defendant argues that California's criminal

49

justice system violates equal protection because "[c]riminal defendants are treated less favorably than . . . civil litigants." Specifically, he notes that criminal defendants, unlike civil litigants, have no general right to take depositions. But civil litigation is entirely different from criminal litigation, and there is no requirement the two systems be similar. In rejecting the argument that treating capital defendants differently from noncapital defendants violates equal protection, we have explained that "persons convicted under the death penalty law are manifestly not similarly situated to persons convicted under the Determinate Sentencing Act and accordingly cannot assert a meritorious claim to the 'benefits' of the act under the equal protection clause [citations]." (*People v. Williams* (1988) 45 Cal.3d 1268, 1330.) Criminal defendants are also not situated similarly to civil litigants. Rather than being treated less favorably than civil litigants, they have many rights not afforded civil litigants, including, for example, the right not to be deposed. Not giving criminal defendants the right to take depositions does not violate equal protection.

### III. CONCLUSION

We affirm the judgment.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY LIU, J.**

I join the court's opinion and offer the following observations about the trial court's excusal of a prospective juror for cause. (See maj. opn., *ante*, at pp. 24–29.)

In excusing the prospective juror, the trial court stated: "I don't know that the law would require that someone violate a precept of their religious beliefs, even though this man presumably was willing to do that if I ordered him to do that, but — but I think that it is — I think that it is cause."

The meaning of the trial court's observation is not entirely clear. (See maj. opn., *ante*, at p. 28.) It is true, as the trial court may have intended to suggest, that a prospective juror who is unwilling or unable to violate the dictates of his or her religion or personal conscience in deference to the law cannot be compelled to serve on a jury. But it is not true that a prospective juror who agrees to perform the duties of a juror cannot be required to set aside his or her religious beliefs or personal views during jury service. Indeed, that is exactly what the law requires when citizens accept the responsibility to discharge this solemn and vitally important civic duty. (See Code Civ. Proc., § 232, subd. (b) [jurors must swear an oath that they will render a true verdict " 'according *only* to the evidence presented . . . and to the instructions of the court' " (italics added)].)

Accordingly, a prospective juror may not be excused for cause *simply* because jury service would require him or her to violate a religious belief or some other matter of personal conscience. The relevant question is whether,

1

notwithstanding any conflict between a prospective juror's personal beliefs (religious or otherwise) and the requirements of jury service, the prospective juror is able to subordinate those beliefs to the responsibility to apply the law. Prospective jurors who are "willing to temporarily set aside their own beliefs in deference to the rule of law" may not be excused for cause. (*Lockhart v. McCree* (1986) 476 U.S. 162, 176; see *Uttecht v. Brown* (2007) 551 U.S. 1, 6 ["[b]ecause '[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State,' " it follows that " 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty . . . ' "]; *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522 ["[W]e hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."].)

In this case, the record supports a finding that the prospective juror would have been substantially impaired in the performance of his duties as a juror and was therefore properly excused for cause. Although the juror said he could follow the law if required to do so, the question is whether the juror would have been *substantially* impaired, that is, impaired to a substantial degree. The juror's discursive answers during voir dire (see maj. opn., *ante*, at pp. 24–26) were sufficient to leave the trial court "with the definite impression that [he] would be unable to faithfully and impartially apply the law." (*Wainwright v. Witt* (1985) 469 U.S. 412, 426.) Thus, substantial evidence supports the trial court's decision to excuse him for cause.

LIU, J.

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rountree

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S048543
**Date Filed:** May 23, 2013

_____

**Court:** Superior
**County:** Kern
**Judge:** Lee Phillip Felice

_____

**Counsel:**

Peter R. Hensley, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric Christoffersen, Kathleen A. McKenna, Leslie W. Westmoreland and Sarah J. Jacobs, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Peter R. Hensley
315 Meigs Road, Suite A-382
Santa Barbara, CA  93109
(805) 403-8460

Sarah J. Jacobs
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA  93721
(559) 477-1673