Filed 11/8/23  P. v. Cordero CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EDDIE LEON CORDERO,<br><br>Defendant and Appellant. | F085025<br><br>(Fresno Super. Ct. No. F21904232)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant shot and killed two people, and wounded a third, after an argument at a bar. The jury convicted him of assault with a firearm and two counts of murder, while finding true two multiple-murder special circumstances attached to the two murder counts. Defendant contends the court committed prejudicial instructional error and that his second multiple-murder special circumstance must be stricken.

We conclude the court gave an erroneous but harmless instruction overly restricting the jury's consideration of voluntary intoxication evidence. We also accept the Attorney General's concession that, under current Supreme Court precedent, the second multiple-murder special circumstance must be stricken. We affirm the judgment as modified.

## BACKGROUND

In an information filed November 15, 2021, the Fresno County District Attorney charged defendant Eddie Leon Cordero with two counts of murder (counts 1-2; Pen. Code, § 187, subd. (a)),[1] and assault with a firearm (count 3; § 245, subd. (a)(2).) As to counts 1 and 2, the information alleged a multiple-murder special circumstance (§ 190.2, subd. (a)(3)) and a firearm enhancement under section 12022.53, subdivision (d). As to count 3, the information alleged a great bodily injury enhancement. (§ 12022.7, subd. (a).)

A jury convicted defendant of first degree murder on counts 1 and 2, and assault with a deadly weapon on count 3, and found true all enhancements/special circumstances. The court sentenced defendant to two consecutive terms of life without the possibility of parole on counts 1 and 2, plus two 25-year-to-life terms for the firearm enhancements (§ 12022.53, subd. (g)) to those counts. On count 3, the court imposed a prison term of three years, plus three years for the great bodily injury enhancement. (§ 12022.7, subd. (a).)

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise stated.

# FACTS

On May 21, 2021, Angel Mejia, Santiago Garcia and Carlos Hernandez met up with defendant in Old Town Clovis at around 9:00 p.m. The group had drinks at a bar called The Palace. They drank, danced, and generally "had a good time."

At some point, a man in a jacket approached Mejia and they exchanged names. From there, "things started … escalating," though Mejia did not know "necessarily what started it." A few seconds later, a person with long hair and a polo shirt approached and told defendant, "This ain't Hollywood." Defendant became angry, raised his voice, and engaged in a verbal altercation. In Mejia's opinion, defendant did not seem intoxicated, and nothing about his demeanor suggested he was feeling the effects of alcohol.

Mejia tried to deescalate the situation, but things only became more heated. The person in the jacket also tried to calm the person in the polo shirt. Within a few minutes defendant began pounding his fist several times. The person in the jacket told Mejia, "Get your boy." Eventually, Mejia told Garcia that defendant was getting hotheaded. Mejia and Garcia decided to "call it a night."

Mejia, Garcia, and defendant left at around 12:30 a.m. and walked to Mejia's vehicle in front of a restaurant next door. Defendant was acting aggressively and sounded mad. Mejia drove, defendant sat behind him, Garcia was in the front passenger seat and Hernandez was in the rear passenger seat. Mejia drove about 15 minutes to drop off defendant at home. During the drive, defendant "kept mouthing off." Mejia heard a "clicking noise" coming from the backseat where defendant was seated. At trial, Mejia said he was not sure what the noise was, and that it could have been a seat belt or "anything." At the preliminary hearing, however, Mejia testified that it sounded like defendant had cocked a gun.

Meanwhile, Robert R. was working as a disc jockey (D.J.) for The Palace that night. Robert announced "last call" at around 1:40 a.m. He then said goodbye to the crowd and packed up his D.J. equipment. At around 2:00 a.m., Robert heard three

3.

gunshots and took cover. He eventually heard a total of 12 to 13 gunshots. Robert felt pain and observed that he had been shot in the leg. Robert was transported to Clovis Community Hospital and underwent surgery.

The shooting was captured on surveillance cameras from multiple angles. The footage shows Andres Sanchez and Merehildo Luna fall to the floor. Luna died at the scene, and Sanchez was pronounced deceased at a hospital. They both died from gunshot wounds.

Law enforcement determined defendant was the shooter captured on camera and contacted him in Phoenix, Arizona. Defendant had a handgun in his possession, but it was not the one used in the subject shooting.

Law enforcement officers interrogated defendant. Defendant initially claimed he did not remember anything from the night in question and was "drunk as f[**]k." Defendant said he had begun drinking at "[m]aybe about like five or six," but "it wasn't like, like a lot, a lot …." Defendant said he did not go to the bar to start problems, "but it seems like that's what happened sometimes … guys … had to get up in my face and instead of lookin' at girls they wanna look at you." One of the people at the bar said something like "let's go to the back." Defendant did not know what he meant.

Defendant claimed he did not remember anything after he and his group left the bar. He suggested he did not remember because he was doing drugs or alcohol.

Defendant cut his hair and travelled to Arizona because he was scared, knowing he had done something wrong. Defendant later said, "I made a mistake." When asked if he meant to kill defendant replied, "Not two people." Defendant said, "I don't really remember what, what I wanted to do, but I know I didn't want to kill no – like a bunch of people, like shot and … hit a bunch of people."

Detectives asked if defendant's intended target was the "skinny" guy with long hair, to which defendant answered, "I don't know to be honest. I think so."

4.

At one point, when defendant said he did not remember how many shots he took, he made a shooting motion with his hand. Additionally, just before defendant was shown the video of him walking into the bar, he stood up and made a "shooting" gesture.

**Jail Call**

Defendant called his sister from jail on November 9, 2021. A recording of the call was played for the jury. In the call, defendant said, "Angel hella snitched on me."[2] Defendant later claimed Mejia was lying. Defendant said Mejia "better hope I never get out [of] this mother[**]ker or something. [He] better move out of Fresno or something. Because I'm going to be right back in this motherf[**]ker with the same shit … if I ever see that motherf[**]ker again, bro."

## DISCUSSION

### I. Voluntary Intoxication Instruction was Erroneous, but Harmless

Defendant contends the court erred in instructing the jury regarding intoxication evidence.

#### *Law*

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).)

#### *Additional Background*

Here, the defendant was charged with murder and the court instructed the jury as follows:

---

[2] Context strongly indicates defendant's reference to Angel was to Angel Mejia, so we will refer to this individual as "Mejia" going forward.

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence *only* in deciding whether the defendant acted with an intent to kill.[3]

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using an intoxicating drug, drink or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"You may not consider evidence of the defendant's voluntary intoxication for any other purpose." (Italics added.)

In addition to CALCRIM No. 625, the court also instructed the jury with

CALCRIM No. 626 as follows:

"Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.

"A person is voluntarily intoxicated if he or she becomes intoxicated by using any intoxicating drug, drink or other substance – a person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life.

---

[3] CALCRIM No. 625, on which these instructions were based, has bracketed language, which the court excluded here:

"You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [*the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted*[,]] [or the defendant <insert other specific intent required in a homicide charge or other charged offense>.]" (Italics added.)

The bench notes to this instruction state, "If the defendant is charged with a homicide crime that has as an element an additional specific intent requirement other than intent to kill, include the required intent in the last bracketed portion of the second sentence." Here, defendant was charged with premeditated murder. For the reasons explained herein, the court should have given the bracketed, italicized language here.

If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

"Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:

"One, the defendant killed without legal justification or excuse;

"Two, the defendant did not act with the intent to kill;

"Three, the defendant did not act with a conscious disregard for human life;

"And four, as a result of voluntary intoxication the defendant was not conscious of his actions or the nature of those actions.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

In closing argument, the prosecutor argued that because of the surveillance video and confession, the issue for the jury was not whether defendant committed the killings but rather: "[W]hat was his mental state."

Later, the prosecutor made the following argument:

"Now, you're going to hear some argument about whether the defendant knew what he was doing, whether he was unconscious at the time. And I want you to go back and I want you to watch this video and I want you to tell me if it looks like [defendant] doesn't know what he's doing. He absolutely knows what he's doing. And so while he is shooting the gun, he not only shoots Mr. Luna four times – and again if somebody is so intoxicated, are they going to be able to shoot an individual … their intended target four times, as well as the other individual that was nearby five times, if they're so intoxicated? No. Absolutely not."

Later still, the prosecutor argued:

"There is also the verdict form for the lesser [included offense] of second degree. And then if you cannot all agree as to first or second, that's when you would only go to involuntary manslaughter. And that is only if you believe that the defendant was not able to form the intent to kill. And I'm not sure what evidence, if any, there is of that. Except for the defendant's own self-serving statement that he was, quote, unquote, 'hella drunk.'

7.

Okay. But we have no other evidence to show that he didn't know exactly what he was doing."

Defense counsel argued:

"We're also going to talk a little bit about the law of intoxication. And these both come out of the instructions that the judge read to you. You can consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You can consider that evidence only in deciding whether the defendant acted with an intent to kill. In other words, did his intoxication affect his ability to form the mental state necessary for first degree murder, that intent to kill. Okay? Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but they may not be aware of his or her actions or the nature of those actions.

"So Ms. Smith [prosecutor] is telling you, oh, it doesn't look like Eddie [defendant] is stumbling around in the bar, it doesn't look like he is falling, tripping over himself when he is running back to the car. Unconsciousness has nothing to do with physical coordination. It has to do with whether your brain is functioning normally or whether your brain has been sort of shut off, that your higher reasoning has been cut off from your ability of your brain to operate your body.

"It's all about the mental state. Which is what I told you at the very beginning of my opening statement. Taking into account his consumption of alcohol and possibly drugs. Has Ms. Smith proven beyond a reasonable doubt that Eddie had malice aforethought? Has she proven that he killed with deliberation and premeditation? Has she proven that he was not unconscious at the time of this act and that his intoxication did not prevent him from forming that intent to kill? That burden is on Ms. Smith. So she briefly stated in her opening, well, if you don't believe Mr. Richter's contention that Eddie was unconscious – you don't have to believe that Eddie was unconscious. You have to believe that he was not unconscious beyond a reasonable doubt. I don't have a burden here. And I'm going to come back to that.

"What has Ms. Smith proven to you beyond a reasonable doubt was going through Eddie's mind at the time when he walked into The Palace at 2 o'clock in the morning or 2:05 abouts as we saw on the video. The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder, and then, again, assuming you still believe there's malice,

8.

that the murder is second degree. And, again, the burden is on Ms. Smith to prove to you that Eddie had the necessary mental state. It is not my burden to prove to you that he did not have it.

"So did Eddie intend to kill when he walked up to the bar at 2:05, in which case this would be first degree murder, or did he just intend to shoot the place up and he wasn't really thinking about what the consequence of shooting the place up might be? In which case it might be second degree murder. Or was he even conscious of his actions at all? In which case we're looking at a case of voluntary manslaughter."

*Analysis*

The instructional error here is plain. Because defendant was charged with murder, the evidence of voluntary intoxication was admissible on the following issues: "whether or not the defendant actually formed a required specific intent, or … whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) However, the instructions told the jury the evidence was "admissible" on *only* one issue: intent to kill. The instructions expressly forbade the jury from considering the evidence on any other issue. Yet, as section 29.4, subdivision (b) makes clear, the jury clearly should have been able to consider that evidence on the issues of premeditation and deliberation as well. (See § 29.4, subd. (b).)

The Attorney General cites *People v. Hughes* (2002) 27 Cal.4th 287 and *People v. Castillo* (1997) 16 Cal.4th 1009, cases where the Supreme Court rejected claims the voluntary intoxication instructions were misleading. However, in those cases the trial courts instructed the jury it could consider evidence of voluntary intoxication on the issues of specific intent *or mental state*. (*Hughes*, at p. 340; *Castillo*, at p. 1014.) In both cases, the Supreme Court held that the jury would have understood that deliberation and premeditation are "mental states," and therefore the instructions did not preclude them from considering the evidence as to that issue. (*Hughes* at p. 342; *Castillo* at p. 1016.) In the present case, however, the instructions only permitted the jury to consider the voluntary intoxication evidence on the issue of "intent to kill" – they did not broadly

9.

permit consideration for "mental state[s]" as the instructions did in *Hughes* and *Castillo*. Consequently, there was no analogous basis for the jury here to believe it could consider the evidence of voluntary intoxication for an issue other than intent to kill, such as premeditation/deliberation.

The Attorney General also observes that defense counsel argued in closing that the jury should consider evidence of voluntary intoxication on issues other than intent to kill. However, this fact does not solve the problem presented by the erroneous jury instruction. Even if the jury inferred from closing argument that defense counsel believed the jury could consider the evidence of voluntary intoxication on issues other than intent to kill, it would not change the fact that the court's instructions said otherwise. Moreover, the court had previously instructed the jury, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

Having concluded the instructions are erroneous, we turn to the issue of prejudice.

### *Prejudice*

Defendant contends the error violated his rights under the federal constitution and therefore should be evaluated under *Chapman v. California* (1967) 386 U.S. 18, and not *People v. Watson* (1956) 46 Cal.2d 818. However, the error here was functionally equivalent to excluding defense evidence and "is thus subject to the usual standard for state law error: 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' " (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134–1135.)

### *Premeditation/Deliberation*

We conclude there is no reasonable probability the error affected the verdict here. We begin with the observation that the jury was permitted to consider the evidence of voluntary intoxication on the issue of intent to kill and yet still convicted defendant of first degree murders. Consequently, it is clear the jury concluded the evidence of voluntary intoxication did not raise a reasonable doubt as to whether defendant actually

formed intent to kill. We find it highly unlikely that, having reached such a conclusion on the present evidence, the jury would have also determined the same evidence of voluntary intoxication *did* raise a reasonable doubt as to whether defendant premeditated and deliberated the murder. While intent to kill and premeditation/deliberation are obviously not synonymous, there is no reason to think the jury would have found defendant's claims of intoxication to police were insufficient to negate the inference he formed intent to kill but sufficient to negate the inference he premeditated/deliberated.

There was little to no basis to conclude the defendant could have harbored intent to kill but did not premeditate/deliberate. The argument between defendant and the victim preceding the shooting by more than an hour. And the surveillance video shows that when defendant arrived back at the bar around 2:00 a.m., he walked straight up to the entrance and fired at victim Luna within seconds. Had there been a lengthier gap of time, during which some other or additional motive to kill could have arisen (such as additional arguing), then perhaps a factfinder might entertain some doubt as to whether defendant had premeditated the killing before approaching the establishment. However, since defendant walked up to the door and quickly began shooting at Luna, the inference that defendant had been premeditating the killing of Luna for some appreciable time before pulling the trigger is overwhelmingly strong.

### *Involuntary Manslaughter*

Defendant observes the instructional error also had the effect of "precluding the jury from also considering this evidence in determining whether [he] was unconscious and hence was only guilty of involuntary manslaughter.…" We agree.[4] However, we find the error harmless in this respect as well.

---

[4] It is true, as the Attorney General points out, that CALCRIM No. 626 included as an element: defendant's unconsciousness of his actions or the nature of those actions due to voluntary intoxication. However, that does not change the erroneous nature of the other instruction expressly restricting consideration of voluntary intoxication evidence to the issue of intent to kill. While a jury may have figured out that evaluating the

11.

Because it convicted defendant of first degree murder, the jury necessarily found he acted with malice. That is, he either intended to kill (express malice) or intentionally pulled the trigger *knowing* his act was dangerous to human life and *deliberately* acting with *conscious* disregard for human life (implied malice). The jury made these determinations under instructions permitting it to consider voluntary intoxication evidence in evaluating "*whether* the defendant acted with an intent to kill .…"

The finding of malice – for which the voluntary intoxication evidence was in play – precludes any possibility the jury would have found defendant was unconscious of his actions and therefore liable only for involuntary manslaughter. A person cannot intend to kill nor deliberately act with conscious disregard for human life while also being unconscious as to those actions or the nature of the actions. Consequently, the jury's verdict establishing malice demonstrates the harmlessness of the error as to involuntary manslaughter.

## II. The Court did not Err in Omitting Voluntary Manslaughter Instruction

### *Law*

" ' "[A] trial court must give ' " 'instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " ' " (*People v. Bell* (2019) 7 Cal.5th 70, 109.) This standard is not met by pointing to *any* evidence, no matter how weak. (*Ibid*.) Instead, the evidence must be substantial enough to merit consideration by a jury; meaning evidence from which a reasonably jury could actually conclude only the lesser offense was committed. (*Ibid*.)

---

consciousness element under CALCRIM No. 626 would require ignoring the express restrictions given by the court in its giving of CALCRIM No. 625, the fact is the jury should not have had to navigate the confusing and contradictory instructions. The court should have given the bracketed portion of CALCRIM No. 625 that expanded consideration of the evidence beyond intent to kill to include unconsciousness (and premeditation/deliberation).

Here, defendant contends the court should have instructed on voluntary manslaughter as a lesser included offense because there was evidence from which the jury could conclude "heat of passion" applied.

" 'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively.… "[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.…" ' " (*People v. Rountree* (2013) 56 Cal.4th 823, 855.)

*Analysis*

Here, there was not sufficient evidence as to the objective requirement so as to merit consideration by a jury. Defendant observes that his friend testified one of the men[5] arguing with defendant told him, " 'This ain't Hollywood.' " Defendant speculates this might have been a taunt or derogatory comment about his clothing or appearance.[6] But this is quite simply not a circumstance that would arouse the passion of an "ordinarily reasonable person." No reasonable jury could conclude the objective element of 'heat of passion' was met here.

The court did not err in omitting instruction on voluntary manslaughter.

III.    **No Cumulative Prejudice**

Defendant contends the court's errors in this case had a cumulative effect that was prejudicial. However, for the reasons explained above, we conclude defendant has only identified a single error in this case: the instruction that erroneously limited the jury's

---

[5] Context indicates the man was Luna.

[6] Defendant also points to evidence he contends supports the subjective component. However, because we have found the evidence insufficient as to a different necessary component (the objective component), we do not address these points. Nor do we address contentions concerning invited error or harmlessness.

13.

consideration of voluntary intoxication evidence to the sole issue of intent to kill. We have found that error harmless and there are no additional errors to consider.

## IV.    One of the Multiple Murder Special Circumstances Must be Stricken

Defendant contends, and the Attorney General concedes, that the jury should not have been permitted to find two multiple-murder special circumstances, one for each murder. In light of controlling Supreme Court precedent (see, e.g., *People v. McWhorter* (2009) 47 Cal.4th 318, 378) we accept the concession and strike the multiple-murder special circumstance to count 2.

## DISPOSITION

The multiple-murder special circumstance attached to count 2 is stricken. The trial court shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment. So modified, the judgment is affirmed.


POOCHIGIAN, Acting P. J.

WE CONCUR:


DETJEN, J.


SNAUFFER, J.

14.